**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-00045-TNM** |
| **JOHN EDWARD CROWLEY** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant John Edward Crowley to 21 months of imprisonment, in the middle of the applicable Guidelines range, 3 years of supervised release, $2,000 in restitution, and a $160 special assessment.

## I.   INTRODUCTION

Crowley participated in the January 6, 2021, attack on the U.S. Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

Crowley and fellow members of the Guardians of Freedom ("GoF"),[2] a militia organization loosely affiliated with the Three Percenters,[3] traveled from Florida to Washington, D.C. to attend the "Stop the Steal" rally on January 6, 2021. After attending the rally, Crowley made his way to the Capitol and entered its restricted grounds. Crowley joined the rioters in the Lower West Terrace Tunnel (the "Tunnel"), a narrow passage from the temporary inaugural platform to the Capitol building. Crowley participated in the attack on the police officers defending the Tunnel, at one point pushing against the riot shield of MPD Officer Henry Foulds. Despite being pepper sprayed at least seven times and expelled from the Tunnel, Crowley forced his way inside the Tunnel a second time, pushing against the police line as part of the rioters' coordinated heave-ho effort. The police sprayed Crowley again, forcing him out of the Tunnel for a second time. Undeterred, Crowley approached the Tunnel a third time and left only after being sprayed

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

[2] According to its website, GoF "is a group of Patriots that are willing to do whatever it takes to free our country from the socialist[s] that are trying to take control." GoF is led by Jeremy Liggett, a former candidate for Congress, who posted a video on January 3, 2021, in which he advised "all of you Patriots out there going to Washington" on which "defensive tools" to carry, including stun guns, pepper spray and short-bladed knives. Alan Feuer and Zach Montague, *Texts Show Oath Keepers Coordinated With Other Far-Right Groups*, N.Y. Times (Oct. 13, 2022), https://www.nytimes.com/2022/10/13/us/politics/oath-keepers-trial-texts.html.

[3] According to the Anti-Defamation League, the "Three Percenters are part of the militia movement, which supports the idea of a small number of dedicated 'patriots' protecting Americans from government tyranny, just as the patriots of the American Revolution protected early Americans from British tyranny. The Three Percenter concept, created in 2008, is based on an inaccurate historical claim that only three percent of Americans fought in the Revolutionary War against the British." Anti-Defamation League, Three Percenters (June 26, 2017), https://www.adl.org/resources/backgrounder/three-percenters.

yet again by police at the mouth of the Tunnel. Later that day, Crowley bragged to his friends about his exploits in the Tunnel saying, "[I got sprayed] once, and went back for more twice!" and "It was Patriots that stormed the capital, not antifa [I was] pepper sprayed 3 times."

The government recommends that the Court sentence Crowley to 21 months of incarceration to reflect the gravity of Crowley's conduct, his lack of remorse, and the need to deter others from engaging in political violence.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

The government refers the court to the Criminal Complaint in this case for a short summary of the January 6, 2021 attack on the U.S. Capitol by hundreds of rioters to disrupt the peaceful transfer of power after the 2020 presidential election. *See* ECF No. 5-1 at 1.

### B.   Crowley's Role in the January 6, 2021 Attack on the Capitol

On December 25, 2020, Crowley, through his Instagram account "eddiepalmfronds," announced that he would be travelling to Washington, D.C. as part of GoF to "protest the fraudulent election and re-establish liberty for our nation." Crowley made clear his awareness that a Joint Session of Congress would be meeting to "count Electoral College votes" and asked for money for the purchase of, among other things, "tactical gear."

3



*Image 1: Government Trial Exhibit 202*

On January 5, 2021, Crowley and other GoF members drove from Florida to Washington, D.C., to attend the former President's "Stop the Steal" rally at the Ellipse on January 6. Crowley's group came to Washington, D.C. prepared for violence, having previously circulated a packing list for January 6 that included body armor, helmets, face covers "to secure your identity," mace/pepper spray, a knife up to 3 inches in length, and "squirt bottles for milk (eye wash)."



*Image 2: Government Trial Exhibit 203.2*

After attending the rally, Crowley did not go directly to the Capitol, but rather went back to his hotel room to retrieve his tactical vest and belt. After obtaining his tactical gear, Crowley made his way to the Capitol, entering its restricted grounds. Around 3:09 p.m., Crowley and his fellow GoF members were on the West Plaza near the scaffolding where a giant American flag had been draped. For approximately the next 20 minutes, Crowley made his way through the large crowd, climbing the northwest steps onto the Lower West Terrace.

By 3:34 p.m., Crowley and Joseph Pavlik were the first GoF members to arrive at the mouth of the Lower West Terrace Tunnel.[4] Indeed, Crowley testified that both he and Pavlik led GoF members to the Tunnel at various times. Tr.161:10-19, 169:10-17 (Oct. 17, 2023).[5] For the next 20 minutes at the mouth of the Tunnel, Crowley had a front row seat to the violence and chaos, including rioters attacking police officers inside the Tunnel. Around 3:40 p.m., Crowley witnessed another rioter dangling from the wall at the mouth of the Tunnel. He continued to linger around the left side of the Tunnel entrance for the next ten minutes.



*Image 3: Screenshot from Government Trial Exhibit 108 (at 7:21 elapsed)*
*(Crowley circled in red, Pavlik circled in yellow)*

---

[4] The Tunnel was a temporary corridor entryway that led into the U.S. Capitol building and that was created as part of the construction of the inaugural platform. At the end of the Tunnel were two sets of glass double doors, emblazoned with the sign "Members Entrance Only," which opened directly into the heart of the U.S. Capitol building. After the police perimeter was breached on the West Plaza, many of the police officers retreated into the tunnel to regroup. However, the rioters, including Crowley, streamed into the Tunnel in large numbers where they began to fight the police in an attempt to enter the U.S. Capitol building. By 2:43 p.m., one of the "member's only" glass doors had been shattered and both doors were open, exposing the very center of the Capitol building. A group of officers using their bodies to barricade the entrance constituted the only barrier between the rioters in the Tunnel and access to the Capitol building.

[5] An excerpted trial transcript from October 17, 2023 has been attached to this Memorandum as Government Sentencing Exhibit 6.

At approximately 3:50 p.m., Crowley participated in a heave-ho effort against the police line in the Tunnel. *See* Government Sentencing Ex. 1 (from 1:38 to 2:05 elapsed). This heave-ho effort—by which multiple rioters collectively used their body mass for greater force in pushing back against officers—resulted in physical force and pressure being placed upon the officers in the Tunnel. The heave-ho was made against the direction and active resistance of the officers, who repeatedly instructed rioters to back up, disperse, and leave.

Around 3:51 p.m., a rioter appeared to spray chemical irritant in the direction of the police line, and the police responded by deploying their own chemical irritant. *See* Government Sentencing Ex. 1 (from 2:30 to 2:47 elapsed). During this time, Crowley can be seen pulling his baseball cap over his face to shield his eyes, but he still did not leave his position at the left side of the Tunnel. One minute later, Crowley contributed to another heave-ho effort against the police line. *See id.* (from 3:10 to 3:43 elapsed).

Beginning around 3:54 p.m., Crowley stood by for the next several minutes as a rioter in a black jacket and hat viciously assaulted police officers at the mouth of Tunnel. This rioter kicked police officers from an elevated position, grabbed a pole from another officer, and bashed a different pole against a riot shield until it broke, and can be heard shouting, "Let us in!" *See* Government Sentencing Ex. 2 (from 0:00 to 1:00 elapsed)



*Image 4: Screenshot from Government Sentencing Exhibit 2 (Crowley circled in red)*

About one minute later, Crowley bent forward, braced himself, and started pushing in an attempt to enter the Tunnel. *See* Government Sentencing Ex. 2 (from 1:10 to 1:30 elapsed).

8



*Image 5: Screenshot from Government Sentencing Exhibit 2 (Crowley circled in red)*

After pushing, Crowley supported another rioter as he assaulted police. By hanging from the mouth of the Tunnel, this rioter kicked and stomped officers from an elevated position. Crowley then allowed the rioter to stand on his shoulders for approximately eleven seconds. While on Crowley's shoulders, the rioter grabbed a riot shield floating above the crowd and proceeded to kick the officers again before standing on someone else. *See* Government Sentencing Ex. 2 (from 1:40 to 2:03 elapsed). Although Crowley testified at trial that he tried to get this rioter off his shoulders, he also admitted on cross examination that this rioter did not cause him to leave even though the scene was like "a zoo." Tr. 167:10–168:7 (Oct. 17, 2023).

For the next several minutes, Crowley pushed further into the Tunnel where he engaged in another significant push against the police line and rioters were repeatedly sprayed by police (including in Crowley's vicinity). *See* Government Sentencing Ex. 1 (from 8:45 to 9:25 elapsed, from 12:00 to 12:40 elapsed, from 14:40 to 15:20 elapsed).

9



*Image 6: Screenshot from Government Sentencing Exhibit 2 (Crowley circled in red)*

By 4:05 p.m., Crowley had successfully fought his way fully into the Tunnel. Once inside, Crowley engaged in a physical altercation with MPD Officer Henry Foulds, pushing against his riot shield to move deeper into the Tunnel. Crowley pushed against Officer Foulds for more than a minute, even after being sprayed with chemical irritant. *See* Government Sentencing Ex. 3 (from 2:28 to 4:15 elapsed); Tr. 51:9–54:25 (Oct. 17, 2023). The fact that Crowley was sprayed at least seven times during his first incursion into the Tunnel is significant because officers spray the most threatening rioters when responding to a civil disorder. Tr. 164:11-14 (Oct. 16, 2023). Crowley's attack had its intended affect—it impeded Officer Foulds' ability to protect the Capitol building and its occupants on January 6 during a violent riot. Tr. 61:8–62:2 (Oct. 17, 2023).



*Image 7: Screenshot from Government Sentencing Exhibit 3 (Crowley circled in red)*

At approximately 4:08 p.m., law enforcement succeeded in pushing Crowley back to the mouth of the tunnel. *See* Government Sentencing Ex. 3 (at 5:23 elapsed). Before leaving the Tunnel, Crowley lifted a stolen police riot shield above his head and passed it back into the crowd so that the police could not use it to defend themselves. *See id.* (from 5:30 to 5:45 elapsed). Shortly thereafter, Crowley left the area around the mouth of the Tunnel and remained on the Lower West Terrace for the next few minutes.

11



*Image 8: Screenshot from Government Trial Exhibit 101A.2 (Crowley circled in red)*

Starting around 4:15 p.m., undeterred by the chemical spray and his prior expulsion from the tunnel, Crowley approached the mouth of the Tunnel for a second time with other GoF members. As he did so, Crowley also urged other rioters to join in his attempt to force his way past the police, shouting "C'MON" three times to the rioters behind him. *See* Government Trial Ex. 103A.2 (from 0:50 elapsed to end).

12



*Image 9: Screenshot from Government Trial Exhibit 103*
*(Crowley circled in red, Jonathan Rockholt and Benjamin Cole circled in yellow)*

By 4:20 p.m., Crowley pushed through rioters entered the Tunnel a second time. Once inside, he joined a coordinated heave-ho effort with other rioters to push past police and into the building. About 23 seconds later, the police again sprayed Crowley and expelled him from the Tunnel. *See* Government Sentencing Ex. 4 (from 2:45 to 3:55 elapsed). Afterwards, the police made a concerted effort to push forward and retake the Tunnel, which had been overrun by rioters.

13



*Image 10: Screenshot from Government Sentencing Exhibit 4 (Crowley circled in red)*

After being expelled from the Tunnel a second time, Crowley retreated down the steps and remained on the Lower West Terrace for the next several minutes. Undeterred by being sprayed with chemical irritants the previous two times he entered the Tunnel, at about 4:28 p.m., Crowley began fighting through the crowd toward the Tunnel for a third time. This time, police sprayed Crowley when he reached the mouth of the Tunnel about four minutes later. *See* Government Trial Ex. 101A.4 (from 3:16 to 3:30 elapsed). Despite being sprayed again, Crowley remained at the mouth of the Tunnel for two more minutes, recovering from the effects of the spray. *See* Government Trial Ex. 110 (from 8:00 to 8:55 elapsed). During this time, police continued to spray rioters clashing with the police line at the entrance to the Tunnel. These rioters threw objects and bashed poles against riot shields. *See* Government Trial Ex. 101A.4 (from 3:30 elapsed to end).

14



*Image 11: Screenshot from Government Trial Exhibit 101A.4 (Crowley circled in red)*

At approximately 4:34 p.m., Crowley finally left the area around the Tunnel. He remained on the Lower West Terrace and, around 4:49 p.m., a fellow GoF member washed his eyes out from the spray. *See* Government Trial Ex. 111 (from 0:59 to 1:15 elapsed). He left the restricted area around the Capitol shortly thereafter.

Later that day, a contact reached out to Crowley asking, "Crowley you in DC?" At 5:35 p.m., Crowley replied, "I'm there!" and attached two pictures he took at the mouth of the Tunnel. *See* Government Trial Exhibit 206. In the same chat, a contact asked Crowley, "You got sprayed?" to which Crowley answered, "once, and then I went back for more twice!" Crowley also sent text messages stating, "It was Patriots that stormed the capital, not antifa [I was] pepper sprayed 3 times" and "fuck this fraudulent election." *Id.* One day later, Crowley texted the same chat, "I eat my words, antifa was in capital, they were Antifa with some Patriots mixed in people say cops stood by while they let a couple handfuls of people in and then shut it down." *Id.*

On September 8, 2021—well after the events of January 6—Crowley again texted an acquaintance, "I was there, gaurds [sic] were letting people in. Trump never incited any violence, the media and democrats are lying to u."

## III.     THE CHARGES AND COUNTS OF CONVICTION

On February 10, 2023, a federal grand jury returned an indictment charging Crowley with six counts. *See* ECF No. 55. On October 18, 2023, after a two-day bench trial, Crowley was convicted of **(i)** interfering with law enforcement officers during a civil disorder (Count One, 18 U.S.C. § 231(a)(3)); **(ii)** entering or remaining in a restricted building or grounds (Count Three, 18 U.S.C. § 1752(a)(1)); **(iii)** disorderly and disruptive conduct in a restricted building or grounds (Count Six, 18 U.S.C. § 1752(a)(2)); and **(iv)** impeding passage through the Capitol building or grounds (Count Twelve, 40 U.S.C. § 5104(e)(2)(E)). *See* ECF No. 111. The Court acquitted Crowley of aiding and abetting theft of government property (Count Two, 18 U.S.C. §§ 641, 2) and engaging in an act of physical violence in a restricted building or grounds (Count Nine, 18 U.S.C. § 1752(a)(4)).

## IV.     STATUTORY PENALTIES

As noted by the Presentence Report issued by the U.S. Probation Office, Crowley faces up to **(i)** five years of imprisonment, three years of supervised release, a $250,000 fine, restitution, and a $100 special assessment on Count One; **(ii)** one year of imprisonment, one year of supervised release, a $100,000 fine, and a $25 special assessment on Count Three; **(iii)** one year of imprisonment, one year of supervised release, a $100,000 fine, and a $25 special assessment on Count Six; and **(iv)** six months of imprisonment, five years of probation, a $5,000 fine, and a

special assessment of $10 on Count Twelve.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government agrees with the Probation Office's calculation of the combined adjusted offense level of 15.[6] *See* ECF No. 124, PSR ¶¶ 25-46. The Probation Office calculated the defendant's criminal history as category I, which is not disputed. *See* PSR ¶ 48. Accordingly, Crowley's Guidelines range is 18 to 24 months' imprisonment.

### A. Application of U.S.S.G. § 2A2.4(b)(1)(A)

Contrary to the defendant's objections (ECF No. 127), the three-point increase under U.S.S.G. § 2A2.4(b)(1)(A) applies here because Crowley's obstruction of police officers "involved physical contact." This enhancement applies even if the physical contact is not direct. *See United States v. Taliaferro*, 211 F.3d 412, 415-16 (7th Cir. 2000) ("[I]t is clear that the contact between the aggressor and the victim need not be direct, but rather can result from the 'indirect application of force . . . by some substance or agency placed in motion by' the aggressor"); *see also United States v. Stoddard*, 407 F. App'x 231, 233 (9th Cir. 2011); *United States v. Shelton*, 431 F. Supp. 2d 675, 675-77 (E.D. Tex. 2006), *aff'd,* 230 F. App'x 457 (5th Cir. 2007).

---

[6] Under U.S.S.G. § 3D1.2, the Probation Office grouped Count One (civil disorder) and Count Six (disorderly conduct) when calculating the offense level. PSR ¶¶ 25-26. The government respectfully submits that Count Three (unlawful entry) and Count Six should group because the victim is Congress. Count One should be treated as a separate group because the victims were law enforcement officers engaged in their official duties on January 6, 2021. But this disagreement does not change the Combined Adjusted Offense Level of 15. PSR ¶ 43.

Here, the offense involved Crowley's physical contact with Officer Foulds. The video evidence showed Crowley pushing against Foulds through a riot shield for more than a minute. Any assertion that Crowley's contact with Officer Foulds was merely "incidental" (ECF No. 127 at 3) is belied by Officer Foulds' testimony. *See, e.g.*, Tr. 53:23 (Oct. 17, 2023) ("A: It looks like he's leaning and pushing against me"); Tr. 54:16-18 ("Q: That person circled in the red circle . . . you said he was pushing against you? A: Yes."); Tr. 54: 23-25 ("Q: Okay. And he's pushing against that riot shield? A: Yes. And . . . you can actually see that the handles of the riot shield are facing towards the protestors."); Tr: 55:16–56:1 ("Q: What was the effect on you with the rioter pushing against you with a riot shield versus just like pushing with their hand? A: [I]n general, it means that multiple people could push on the same shield and, you know, keep better control of it and push against me while . . . I don't have a place to grip it so I'm just being—having the force of whoever is behind that shield pushed on me. It doesn't appear that other people are pushing on the shield at the moment, so it's just unpleasant."). Because Crowley's obstruction involved physical contact, even if indirect, § 2A2.4(b)(1)(A) applies.

**B.  Application of U.S.S.G. § 4C1.1**

Recent amendments to the Sentencing Guidelines in 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

Although Crowley has no criminal history points, the § 4C1.1 reduction does not apply because Crowley used violence or credible threats of violence in connection with his conviction under § 231(a)(3). When in the Tunnel the first time, Crowley used physical force to push against

18

Officer Foulds for more than a minute and continued to push despite being sprayed by another officer. Indeed, police officers repeatedly sprayed Crowley each time he entered the Tunnel *precisely* because he presented a credible threat of violence. As TFO Arthur testified at trial, police officers are trained to spray the most threatening rioters when responding to a civil disorder. During his second approach to the Tunnel, Crowley encouraged other rioters to engage in violence, shouting "C'MON" three times and urging them to join as he attempted to force his way past the police line. He also repeatedly engaged in heave-ho efforts, pushing back and forth against the police line and putting intense aggregate pressure on the police line.

Although the Court found that Crowley did not assault Officer Foulds and acquitted Crowley of 18 U.S.C. § 1752(a)(4),[7] Crowley still used violence or credible threats of violence as he physically obstructed, impeded, and interfered with police in the tunnel. For that reason alone, a § 4C1.1 reduction does not apply in this case.

Furthermore, and more fundamentally, the Court should not apply § 4C1.1 here because the January 6 riot as a whole was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v.*

---

[7] At trial, the parties agreed that an act of "physical violence" under 18 U.S.C. § 1752(a)(4) is "any act involving an assault or other infliction of bodily harm on an individual or damage to or destruction of real or personal property." By contrast, "violence" and "credible threats of violence" in § 4C1.1 are not defined, and the government submits that Crowley's conduct meets the ordinary meaning of these terms.

*Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption.").

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Due to the unique nature of the January 6 riot, the harms caused by the riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same

sentence regardless of whether § 4C1.1 applies.[8]

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a significant term of incarceration.

### A.   Nature and Circumstances of the Offense

As explained in Section II.B of this memorandum, Crowley's conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of power, and throwing the United States into a constitutional crisis. Beginning around 3:34 p.m., and for the next 30 minutes, Crowley observed and participated in the chaos and violence at the mouth of Tunnel. He had ample opportunity to turn around and leave, but made a choice not to do so. Instead, Crowley forced his way further into the Tunnel, confronting Officer Foulds as he bravely held off rioters in the Tunnel from breaching the Capitol. Crowley was sprayed repeatedly, but still did not leave. He "went back for more twice," as he bragged in a text message from that day. Altogether, Crowley remained unlawfully in the area around the Tunnel for about an hour. This is not a case in which the defendant passively stood around or stumbled into the Tunnel by accident.

The most important factors to consider in Crowley's case include the following: (1)

---

[8] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under § 4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

Crowley entered the Tunnel twice and attempted to enter the Tunnel a third time despite being repeatedly sprayed by police officers; (2) Crowley physically confronted Officer Foulds for more than a minute by pushing against him through a riot shield during his first entry into the Tunnel; (3) Crowley repeatedly engaged in a heave-ho efforts by pushing against the police line in the Tunnel; (4) Crowley lifted a police shield above his head and passed it back into the crowd of rioters, depriving police officers of its protection and enabling its use by rioters; (5) Crowley let another rioter stand on his shoulders for approximately 11 seconds allowing that rioter to grab a police shield and kick the police line; (6) Crowley encouraged others to enter the Tunnel and participate in the violence by shouting "C'MON" three times on his second approach to the Tunnel; (7) Crowley falsely believed that the 2020 presidential election was "fraudulent" and wanted desperately to get into the Capitol building where he knew the electoral certification had been taking place as evidenced by Image 1 above; and (8) Crowley brought tactical equipment with him to Washington, D.C., indicating his awareness for possible violence on January 6. The nature and circumstances of Crowley's offenses establish the need for a sentence of incarceration.

**B.  The History and Characteristics of the Defendant**

Crowley has one prior conviction for disorderly conduct in September 1990. Nothing in his background mitigates his culpability for the crimes he committed in furtherance of the January 6 attack. To the contrary, he is 52 years old and should know better. Nonetheless, Crowley has led a relatively normal life, see PSR ¶¶ 53–65, which accounts for the government's recommendation in the middle of the Guidelines range.

When coupled with his conduct on January 6, Crowley has a recent history of contempt for

law enforcement. During his arrest on August 24, 2022, which was recorded by the FBI, Crowley called the arresting agents "jackasses" and stated that the FBI is the "Federal Bureau of Intimidation, shame on you." Government Sentencing Ex. 5. He then blurted, "y'all should be ashamed. You took an oath . . . shame on y'all . . . letting the democratic media machine use you like this, the Gestapo basically, shame on y'all." *Id.* When asked whether he would like to speak with the FBI, Crowley responded, "there is nothing to talk about. Y'all are part of the Gestapo. There is no reasoning with evil and that's what y'all are." *Id.* Crowley displayed his lack of respect for law enforcement on January 6, 2021, and continued to exhibit that disrespect more than a year-and-a-half later.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Crowley's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was. *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism"). The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to Crowley also weighs heavily in

favor of incarceration. During his first entry into the Tunnel, Crowley was pepper sprayed by police at least seven times. Undeterred by the chemical spray, Crowley entered the Tunnel for a second time, was sprayed by police, and expelled again. Crowley attempted to enter the Tunnel a third time but was sprayed by police at the mouth of the tunnel. Crowley may have gone back a fourth time, but the chemical spray finally incapacitated him when a fellow GoF member had to wash out his eyes on the Lower West Terrace. If repeatedly being pepper sprayed was not enough to deter Crowley, then a sentence of incarceration is necessary to ensure Crowley gets the message that interfering with police during a civil disorder is a serious crime and one that cannot be repeated—particularly when the certification of a democratic election hangs in the balance. Crowley's own statements bragging that he was "pepper sprayed 3 times" and "went back for more" further demonstrate that his sentence must be sufficient to provide specific deterrence from participating in future riots.

Crowley also lacks remorse and has not accepted responsibility for his actions. For example, on September 8, 2021—well after the events of January 6—Crowley texted an acquaintance, "I was there, gaurds [sic] were letting people in." This revisionist history is contradicted by Crowley's own actions on January 6 and undermines any claim of contrition. Crowley engaged with police in the Tunnel as they courageously prevented rioters from entering the Capitol; the police in the Tunnel did not let anyone into the Capitol. This post-January 6 statement, and his statements to the FBI during his arrest, demonstrate a lack of acceptance.

Although the Court, "[i]n general, found the Defendant to be credible" and that "he largely testified honestly," Tr. 4:5-8 (Oct. 18, 2021), Crowley's trial testimony also contains several

24

contradictions and inconsistencies that reinforce his attempt to revise history on January 6.

- Crowley claimed multiple times that he was pushed into the Tunnel. *See, e.g.*, Tr. 104:17–105:1, 106:1-13, 117:7-10, 117:21-25, 146:11-12 (Oct. 17, 2023). But the video evidence showed the exact opposite. Crowley intentionally and voluntarily moved towards the Tunnel on three separate occasions despite having several opportunities to turn around and leave prior to entering the Tunnel. *See, e.g.*, Government Trial Ex. 108 (from 5:40 to 8:40 elapsed). Crowley also repeatedly engaged in heave-ho efforts and pushing against the police line, as described above. Indeed, the Court "disagree[d] with any suggestion that the Defendant was simply forced into the tunnel on either occasion and couldn't get out." Tr. 10:21-23 (Oct. 18, 2023).

- Crowley claimed that he went to the Capitol to serve as a medic. Tr. 102:14-19, 161:22-23, 162:17-20 (Oct. 17, 2023). On cross examination, however, Crowley admitted that he did not offer medical assistance to anyone at the Capitol despite observing injured persons. He also backtracked saying that he used the term medic "loosely." Tr. 160:10-23, 162:11-13, 163:3. The video evidence does not show Crowley administering medical assistance or looking for injured persons. The presentence report does not indicate that Crowley ever received any medical training or served as a medic in any capacity. Nor do Crowley's contemporaneous messages from January 6 and 7 make any mention of him serving as a medic. As the Court found, Crowley's "repeated moves into the very front of the standoff with police, his actions and his subsequent texts demonstrate an intentional involvement with the riot and not just the benign motives he describes." Tr. 6:16-20 (Oct. 18, 2023).

25

- Crowley further claimed that he approached the Tunnel for the third time to offer medical aid to an injured rioter to his right as he walked toward the mouth of the Tunnel. Tr. 119:25–120:7, 121:6-8 (Oct. 17, 2023). However, as he approached, he looked straight ahead at the Tunnel and did not search for an injured person to the right of the Tunnel. *See* Government Trial Ex. 101A.4 (from 0:25 to 3:00 elapsed). He did not turn away from the Tunnel until he was sprayed and, after he was sprayed, video evidence does not show him looking for an injured person. *See* Government Trial Ex. 110 (from 8:00 to 8:55 elapsed).

- Crowley asserted that he followed Pavlik's lead to the inaugural platform and to the Tunnel. Tr. 100:6 (Oct. 17, 2023) ("I was following Pavlik"); 102:17-19 ("And I was basically following Pavlik. He was kind of the elder and, you know, I, the acolyte."). On cross examination, however, Crowley admitted that he at times led a squad of GoF members to the Tunnel and that Pavlik "wasn't in the lead all the time." Tr.161:10-19, 169:10-17. According to the video evidence, Pavlik appeared to follow Crowley during Crowley's first approach to the Tunnel. *See* Government Trial Ex. 108 (from 5:40 to 6:24 elapsed).

- Crowley claimed that, when shouting "C'MON" three times at other rioters, he was urging other members of GoF to come to the rescue of Joseph Pavlik. Tr. 126:2-12 (Oct. 17, 2023). But GoF members Jonathan Rockholt and Benjamin Cole (circled in yellow) were actually in front of him as shown in Image 9 above from Government Trial Exhibit 103. As the Court found, Crowley "was speaking to the rioters in general, not to some colleague to come with him to rescue Mr. Pavlik." Tr. 10:13-17 (Oct. 18, 2023).

26

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United

States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM) (D.D.C.), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, 21-cr-198 (TSC) (D.D.C.), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, § 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the § 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently— differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of

room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[9]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); *see id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[10]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

For example, in *United States v. Doolin*, 21-cr-447-CJN, was convicted of violating 18 U.S.C. §§ 641, 231(a)(3), 1752(a)(1), and 1752(a)(2). Doolin made his way to the West Plaza where he watched and filmed as his friends assaulted a line of police officers. When the line broke, Doolin surged with the mob up the steps and onto the inaugural stage. He then proceeded to the

---

[9] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021") (statement of Judge Pan).

[10] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Upper West Terrace of the Capitol, where he stole a riot shield, and remained there for over an hour, observing the chaos below. Doolin then relocated to the Tunnel where he joined rioters engaging in heave-ho efforts against a police line for several minutes. He used the stolen riot shield to press forward against the police line and lend his weight to the rioters' efforts to push into the Tunnel. Throughout the day, Doolin narrated his actions, bragging about how he had braved tear gas, exclaiming how he and his friends were "trying to take the . . . Capitol," and proclaiming riot to be a "revolution." Judge Nichols sentenced Doolin to 18 months' incarceration and 36 months' supervised release.

A similar sentence is warranted here. Like Doolin, Crowley was an active participant in the Tunnel, pushing against Officer Foulds for more than a minute and engaging in heave-ho pushing against the police line. Although Crowley was acquitted of stealing a police riot shield, Crowley still passed a shield over his head to the crowd behind him, exacerbating a dangerous situation. And Crowley's offense conduct in the Tunnel is more serious than that of Doolin, who only entered the Tunnel once. By contrast, Crowley entered the Tunnel twice, encouraged other rioters to enter the tunnel on his second approach, and attempted to enter the tunnel for a third time despite being pepper sprayed repeatedly by law enforcement officers.

Crowley's offense conduct is particularly egregious compared to other members of GoF who have been sentenced.[11] Unlike Crowley, who repeatedly entered the tunnel and physically

---

[11] *See United States v. Tyler Bensch*, No. 23-CR-180-TNM (D.D.C.) (24 months' probation for disorderly conduct and stealing a police riot shield); *United States v. Jonathan Rockholt*, No. 23-CR-104-TNM (D.D.C.) (5 months' imprisonment for engaging in heave-ho pushing against the police line in the Tunnel and stealing a police riot shield); *United States v. Brian Preller*, No. 23-CR-45-TNM (D.D.C.) (60 months' probation and 8 months' location monitoring for engaging in

confronted the police, co-defendant Jonathan Rockholt engaged in a heave-ho effort once. Unlike Crowley, moreover, Rockholt accepted responsibility and pleaded guilty. Rockholt received a sentence of 5 months of incarceration and 24 months of supervised release for his convictions under 18 U.S.C. § 231 and 18 U.S.C. § 641 pursuant to a plea agreement.[12]

In contrast to Crowley's efforts, co-defendant Joseph Pavlik entered the Tunnel only once for about ten minutes, but, at one point, passed a cannister of pepper spray to another rioter. Furthermore, like Rockholt but unlike Crowley, Pavlik accepted responsibility and pled guilty. It is therefore of little consequence, for purposes of Crowley's case, that Pavlik was sentenced to 2 months of imprisonment and 6 months' home confinement for his convictions, pursuant to a plea agreement, under 18 U.S.C. § 231 and 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A).[13]

Co-defendant Brian Preller, another member of GoF, was sentenced to 60 months of probation and 8 months of location monitoring for his conviction under 18 U.S.C. § 231(a)(3) pursuant to a plea agreement.[14] Preller engaged in pushing against the police line in the Tunnel,

---

heave-ho pushing against the police line in the Tunnel); *United States v. Benjamin Cole*, No. 23-CR-113-TNM (D.D.C.) (48 months' probation and 3 months' location monitoring for engaging in heave-ho pushing against police line in Tunnel); *United States v. Joseph Pavlik*, No. 23-CR-45-TNM (D.D.C.) (2 months' imprisonment and 6 months' home detention for civil disorder and entering a restricted area with a dangerous weapon). Each of these defendants pled guilty and received credit for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1.

[12] The Guidelines range for Rockholt was 10 to 16 months of imprisonment, including credit for acceptance of responsibility.

[13] The Guidelines range for Pavlik was 10 to 16 months of imprisonment, including credit for acceptance of responsibility.

[14] The Guidelines range for Preller was 8 to 14 months of imprisonment, including credit for acceptable of responsibility.

and unlike Crowley's lack of respect for law enforcement and lack of remorse, Preller assisted law enforcement with its investigation.

Crowley's conduct was more serious than any of these defendants. He entered the Tunnel twice, he tried to enter a third time, and he engaged in a one-on-one altercation with Officer Foulds for over a minute. Unlike these defendants, moreover, Crowley never accepted responsibility, much less shown genuine remorse, for his actions. If anything, Crowley's post-January 6 statements show contempt for law enforcement. Accordingly, Crowley's sentence should be higher than that of his co-defendants.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.  § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has

suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Crowley was convicted of a violation of an offense under Title 18, the VWPA applies.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in § 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.

Because Crowley engaged in criminal conduct in tandem with hundreds of other

defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Crowley responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

The Court should require Crowley to pay $2,000 in restitution for his convictions on Counts One, Three, and Six. This amount fairly reflects Crowley's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For these reasons, the government recommends that the Court impose a sentence of 21 months of imprisonment, 3 years of supervised release, $2,000 in restitution, and a $160 special

assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    */s/ Jake E. Struebing*
       JAKE E. STRUEBING
       Assistant United States Attorney
       United States Attorney's Office for the District of
       Columbia
       601 D Street NW
       Washington, D.C.
       (202) 252-6931
       jake.struebing@usdoj.gov

       HOLLY GROSSHANS
       Assistant United States Attorney
       United States Attorney's Office for the District of
       Columbia
       601 D Street, N.W.
       Washington, D.C. 20530
       (202) 252-6737
       Holly.grosshans@usdoj.gov

       JOSHUA ONTELL
       Assistant United States Attorney
       United States Attorney's Office for the District of
       Columbia
       601 D Street, N.W.
       Washington, D.C. 20530
       (202) 252-7706
       Joshua.Ontell@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that, on January 12, 2024, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system which sent notification to all counsel of record.


BY:     */s/ Jake E. Struebing*_____
        JAKE E. STRUEBING
        Assistant United States Attorney
        United States Attorney's Office for the District of
        Columbia
        601 D Street NW
        Washington, D.C.
        (202) 252-6931
        jake.struebing@usdoj.gov