# GOVERNMENT SENTENCING EXHIBIT 6

```
1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2
   * * * * * * * * * * * * * * *   )
3  UNITED STATES OF AMERICA,       )     Criminal Action
                                   )      No. 23-00045
4                 Plaintiff,       )
                                   )
5      vs.                         )
                                   )
6  JOHN EDWARD CROWLEY,            )     Washington, D.C.
                                   )     October 17, 2023
7                 Defendant.       )     9:12 a.m.
                                   )
8  * * * * * * * * * * * * * * *   )

9
                    TRANSCRIPT OF BENCH TRIAL
10        BEFORE THE HONORABLE TREVOR N. McFADDEN
                 UNITED STATES DISTRICT JUDGE
11


12
   APPEARANCES:
13
   FOR THE GOVERNMENT:     HOLLY F. GROSSHANS, ESQ.
14                         JOSHUA ONTELL, ESQ.
                           JAKE STREUBING, ESQ.
15                         UNITED STATES ATTORNEY'S OFFICE
                            FOR THE DISTRICT OF COLUMBIA
16                         601 D Street, Northwest
                           Washington, D.C. 20530
17

18 FOR THE DEFENDANT:      MICHAEL LaFAY, ESQ.
                           JOSEPH FLYNN, ESQ.
19                         NAJAME LAW
                           189 South Orange Avenue
20                         Suite 1800
                           Orlando, Florida 32801
21

22 REPORTED BY:            LISA EDWARDS, RDR, CRR
                           Official Court Reporter
23                         United States District Court for the
                            District of Columbia
24                         333 Constitution Avenue, Northwest
                           Room 6706
25                         Washington, D.C. 20001
                           (202) 354-3269
```

1    BY MS. GROSSHANS:

2    Q.  So at approximately 16:05:08 -- I'm sorry -- 16:05:18,

3    you heard that audio click on.  Is that correct?

4    A.  Yes.

5            MS. GROSSHANS:  If you can please continue.

6            (Whereupon, segments of Government's Exhibit

7    No. 102-A.2 were published in open court.)

8    BY MS. GROSSHANS:

9    Q.  Stopping at 16:05:08, do you see the person that's

10   highlighted with the red circle on the screen?

11   A.  Yes.

12   Q.  And that person is wearing a two-toned baseball --

13   two-toned-colored baseball cap?

14   A.  Yes.

15   Q.  Okay.  And prior to January 6th, you didn't know that

16   person?

17   A.  No.

18   Q.  At this point, approximately how far into the tunnel is

19   he in the video?

20   A.  A few feet.

21           MS. GROSSHANS:  If you can please press play,

22   stopping at 16:05:35.

23           (Whereupon, segments of Government's Exhibit

24   No. 102-A.2 were published in open court.)

25

1    BY MS. GROSSHANS:

2    Q.  And at this point, 16:05:35, can you again see yourself

3    in the video?

4    A.  Yes.

5    Q.  And can you point -- or can you circle yourself in the

6    video for your Honor?

7    A.  (Witness complies.)

8    Q.  Thank you.

9           MS. GROSSHANS:  Your Honor, if the record can

10   reflect that the officer circled himself in the lower

11   right-hand corner of the video.

12          THE COURT:  It will so reflect.

13          MS. GROSSHANS:  Thank you, your Honor.

14   BY MS. GROSSHANS:

15   Q.  Officer Foulds, this person circled in red wearing that

16   baseball cap, at this point, he's where in relation to you?

17   A.  In front of me.

18   Q.  Okay.

19          MS. GROSSHANS:  And I'm going to ask that you

20   please continue, Mr. Clements, stopping at 16:05:39.

21          (Whereupon, segments of Government's Exhibit

22   No. 102-A.2 were published in open court.)

23          MS. GROSSHANS:  Please continue.  I'm sorry.

24   16:05:59.

25          (Whereupon, segments of Government's Exhibit

1    No. 102-A.2 were published in open court.)

2    BY MS. GROSSHANS:

3    Q.  And at 16:05:59, in that snip right before we stopped

4    the video, could you see what the Defendant -- I'm sorry --

5    what the person -- the person circled in red is doing?

6    A.  He had pepper spray towards him and he ducked his head

7    to avoid being sprayed.

8            MS. GROSSHANS:  Can you please continue,

9    Mr. Clements.

10           (Whereupon, segments of Government's Exhibit

11   No. 102-A.2 were published in open court.)

12   BY MS. GROSSHANS:

13   Q.  And did the person wearing the baseball cap just get

14   sprayed again at 16:06:09?

15   A.  I believe so.

16           MS. GROSSHANS:  Can you please continue,

17   Mr. Clements.

18           (Whereupon, segments of Government's Exhibit

19   No. 102-A.2 were published in open court.)

20   BY MS. GROSSHANS:

21   Q.  And the person in that baseball cap, can you see what

22   he's doing to you and that riot shield at 16:06:19?

23   A.  It looks like he's leaning and pushing against me.

24           MR. LaFAY:  I'm going to object, your Honor.  The

25   objection has, I think, been well traveled at this point,

1     but it is an objection under FRE -- Federal Rule of

2     Evidence 701, the first two prongs, the first being that any

3     opinion has to be either from the witness's perception and,

4     second, it has to be helpful to the trier of fact.

5              This is not helpful because it's just narrating

6     what is on the video.  The video is the best evidence under

7     FRE 1002.

8              And -- so that's my objection.  Thank you.

9              THE COURT:  I'm overruling it.

10             In addition to the reasons I previously stated,

11    here we have a witness who is testifying that he's inches

12    from your client.  And so I think he can add something

13    beyond what the rest of us can see just viewing it.

14             So I'm overruling the objection.

15    BY MS. GROSSHANS:

16    Q.  That person circled in the red circle is -- you said he

17    was pushing against you?

18    A.  Yes.

19    Q.  Okay.  And can you see -- you probably couldn't see on

20    January 6th, but can you see now that he's leaning down and

21    pushing towards you?

22    A.  Correct.

23    Q.  Okay.  And he's pushing against that riot shield?

24    A.  Yes.  And the -- you can actually see that the handles

25    of the riot shield are facing towards the protesters.

1    Q.  Okay.  So the handle of the riot shield is actually

2    facing towards that person in the baseball cap?

3    A.  Yeah.  It's -- it does appear to be out of his reach,

4    but it's facing the protesters in general.

5    Q.  What does that mean for you in your ability to wield the

6    shield if you don't have the handles on your side?

7    A.  It makes it very difficult.

8    Q.  All right.  And pushing against that shield and then

9    pushing against you, how does that make you feel?  How does

10   that impact you versus if someone was just kind of pushing

11   with their hand?

12              MR. LaFAY:  Objection.  "How did it make you

13   feel?"  Feelings are irrelevant.

14              THE COURT:  Okay.  Why don't you rephrase.

15   BY MS. GROSSHANS:

16   Q.  What was the effect on you with the rioter pushing

17   against you with a riot shield versus just like pushing with

18   their hand?

19   A.  It doesn't appear to -- in general, it means that

20   multiple people could push on the same shield and, you know,

21   keep better control of it and push against me while I'm kind

22   of -- I don't have a place to grip it so I'm just being --

23   having the force of whoever is behind that shield pushed on

24   me.

25              It doesn't appear that other people are pushing on

1    the shield at the moment, so it's just unpleasant.

2    Q.  Did you give this person with the baseball cap

3    permission to push against you and cause you that unpleasant

4    effect?

5    A.  No.

6    Q.  Did you give him permission to be in the tunnel?

7    A.  No.

8    Q.  What were you trying to do to this person and the other

9    rioters?

10   A.  Push them out of the tunnel.

11          MS. GROSSHANS:  Can you please continue,

12   Mr. Clements, stopping at 16:06:21.

13          (Whereupon, segments of Government's Exhibit

14   No. 102-A.2 were published in open court.)

15   BY MS. GROSSHANS:

16   Q.  Did the officer standing on the ledge just spray that OC

17   canister again?

18   A.  Yes.

19   Q.  And who did he spray it towards?

20   A.  I believe he sprayed it at several targets.  I can't

21   exactly tell from the video.

22          MS. GROSSHANS:  Can we go back to 16:06:19.

23   BY MS. GROSSHANS:

24   Q.  And can you watch if the person in the red circle is

25   sprayed again.

1    please.

2    BY MS. GROSSHANS:

3    Q.  Officer Foulds, at the time that you were in the tunnel,

4    were you a law enforcement officer?

5    A.  Yes.

6    Q.  Were you in uniform?

7    A.  Yes.

8    Q.  The person in the two-toned hat and the other rioters,

9    were they preventing or trying to prevent you from doing

10   your job that day?

11   A.  They were, yes.

12   Q.  What was the effect of their being in the tunnel pushing

13   against you on your ability to do your job that day?

14   A.  It was harder to keep people out of the Capitol both

15   because they were the people we were keeping out of the

16   Capitol, but if we could have formed a straight line at the

17   front of the tunnel, it -- we would -- it would be easier

18   because we would have a smaller face that we were dealing

19   with of people.  But as they pushed their way into the

20   tunnel, it, like, extended our line out and also prevented

21   us from, like, standing shoulder to shoulder in a straight

22   line.  And so it was harder to push people back,

23   effectively.

24   Q.  If the person in the two-toned hat and the other rioters

25   had not been there, would it have been easier for you to do

1    your job that day?

2    A.  Yes.

3            MR. LaFAY:  Objection.  It's a compound question.

4    It deals with the person in the hat, first question,

5    compounded with every other person in the vicinity.

6            THE COURT:  Overruled.

7    BY MS. GROSSHANS:

8    Q.  Did any of the rioters that you confronted in the tunnel

9    tell you that they wanted to leave?

10   A.  Yes.

11   Q.  Okay.  And did you tell them how they could leave?

12   A.  Yeah.  I pointed towards the exit and I said something

13   to the effect of "Just start walking."

14   Q.  Was the person in the USA hat, the two-toned hat, did he

15   ever tell you he wanted to leave?

16   A.  Not that I recall.

17   Q.  You indicated that you've been with the CDU unit for

18   several years?

19   A.  Yes.

20   Q.  How many large rallies or marches would you estimate

21   that you've attended for crowd control with the CDU unit?

22   A.  20 to 50.

23   Q.  Had you ever seen anything like what you saw on

24   January 6th?

25           MR. LaFAY:  Objection.  Irrelevant.

```
1    people behind me.

2    Q.  Let's --

3    A.  You know, there was just a sea of people.

4    Q.  Were you still with Mr. Pavlik at that time?

5    A.  I was.

6    Q.  Were you with anybody else?

7    A.  Apparently, I was with two other members of Guardians of

8    Freedom.  I wasn't aware.  They -- I was new to the group.

9    I didn't know any members.  I knew my -- the guy I slept --

10   shared a hotel room with.

11   Q.  Okay.  When you arrived at the actual Capitol itself,

12   the building itself, not just the lawn, but the building,

13   did you see any sort of signage there that said, Restricted

14   Area, Do Not Enter?

15   A.  I did not.

16   Q.  Did you see any barriers to prevent you from going into

17   that -- that -- that area of the Capitol?

18   A.  I did not.

19   Q.  Did you have anybody out there telling you, Don't go

20   past here; it's a restricted area?

21   A.  No.

22   Q.  And were there thousands of people out there?

23   A.  Pardon?

24   Q.  Were there thousands of people out there?

25   A.  There were thousands of people out there.
```

1    Q.  Okay.  At some point, you walked up onto what we now

2    know is the inaugural stage.  Did you know it was the

3    inaugural stage area at that time?

4    A.  I had no idea.

5    Q.  How -- I guess, what led you up there?

6    A.  I was following Pavlik.

7    Q.  And you were following him -- behind him?

8    A.  I was -- yeah, close to him.  Yes.

9    Q.  Did you know Pavlik that well?

10   A.  I did not.

11   Q.  Did anybody you know know Pavlik that well?

12   A.  Yeah.  Jeremy Liggett, who was leader of GOF, he -- on

13   the way to the Capitol, he said:  That's family; take care

14   of him.

15   Q.  Okay.  And did you know anything else about Pavlik and

16   who -- what he did for a living or anything?

17   A.  I understood he was a police officer or a fire chief or

18   something in New York, or somewhere north.

19   Q.  Okay.  And did you guys kind of -- was there a reason

20   you two stuck together for that -- at that point?

21   A.  Because Jeremy said:  He's family; take care of him.

22   Q.  Okay.  And were you wearing -- were you wearing a belt

23   at this time when you -- I should have asked that a few

24   minutes ago.

25   A.  I was wearing a medical belt.

Crowley - DIRECT - By Mr. Flynn

1    Q.  Okay.  And was those the same items you testified to

2    earlier in that belt?

3    A.  I'm sorry?

4    Q.  Were the same items you testified to earlier in your

5    belt?

6    A.  I'm sorry, Trey.  Can you repeat the question?

7    Q.  Yeah.  Absolutely.

8           The items that you testified to bringing to

9    Washington, D.C., when we talked about the packing list and

10   what was contained within your medical kit, were those on

11   the belt?

12   A.  Correct.

13          MR. FLYNN:  Your Honor, I'm not clear what items

14   he testified to earlier were in the belt.  I'd like to -- I

15   don't think he asked that question, but maybe I missed it.

16          THE COURT:  I heard a lengthy list of medical

17   supplies.

18          MR. FLYNN:  Oh, medical supplies.  I'm sorry, your

19   Honor.

20   BY MR. FLYNN:

21   Q.  So it was that aforementioned list, just for the record,

22   that we discussed that you packed to bring with you to

23   Washington, D.C., that was contained within those pouches on

24   that belt that day?

25   A.  Correct.

1    Q.  Was it your understanding that Mr. Pavlik had medical

2    training?

3    A.  Yes.

4    Q.  Did you two talk about it?

5    A.  Yes.  Very briefly.  I mean, he's a fire chief or police

6    officer, so I'm assuming he had medical training.

7    Q.  At some point, you make your way up near -- and we see

8    it on the video -- at around 3:30-ish p.m., you make your

9    way up near a tunnel kind of off that inaugural stage.

10            Do you recall getting up there?

11   A.  I do.

12   Q.  Okay.  And I guess what -- let me ask this first:  What

13   made -- led you up to that tunnel?

14   A.  Well, initially, from the reports we heard, there were

15   injuries.  There was a shooting.  We didn't know, you know,

16   to -- the extent.  So, you know, we -- you know, if there's

17   anybody we could help with medical assistance, great.  And I

18   was basically following Pavlik.  He was kind of the elder

19   and, you know, I, the acolyte.

20   Q.  At this point, had you listened to any news reports

21   about what was going on?

22   A.  No.

23   Q.  So everything you knew was in front of you at that

24   Capitol; that's all you knew?  What you saw is all you knew?

25   A.  Correct.

1    Q.  You didn't know about any other breaches or anything
2    happening inside, did you?
3    A.  Just the rumors that, you know, you heard on the streets
4    and what -- people listening to their, you know, phones or
5    looking at their phones.
6    Q.  Okay.  So when you arrived to this tunnel, did you see
7    any signage immediately as to --
8    A.  There was no signage.
9    Q.  -- that said you could not enter, Restricted Area, or
10   anything like that?
11   A.  Correct.
12   Q.  Okay.  Did you see any barriers at that point?
13   A.  No barriers.
14   Q.  Okay.  The tunnel itself, were there a lot of protesters
15   in that tunnel?
16   A.  There were no protesters in the tunnel.
17   Q.  Okay.
18   A.  There were protesters -- people outside of the tunnel.
19   Q.  And you were there with Mr. Pavlik at this point?
20   A.  Correct.
21   Q.  Was Mr. Pavlik -- did Mr. Pavlik enter this tunnel at
22   some point?
23   A.  At some point, he did.
24   Q.  Okay.  Were you still outside the tunnel when he
25   entered?

```
 1    A.  I was.
 2    Q.  We see on the video there's kind of a crowd building up
 3    around that tunnel.  Do you recall seeing a crowd?
 4    A.  There was already a crowd there.  Uh-huh.
 5    Q.  Okay.  And at some point we see on the video that you
 6    get closer to the tunnel, closer to the tunnel, and then
 7    finally go into the tunnel.  What exactly happened in that
 8    situation?
 9    A.  Can you repeat that?
10    Q.  Yeah.
11         We see on the video that you're standing outside
12    the tunnel.  Pavlik has gone in.  Correct?
13    A.  Correct.
14    Q.  Okay.  So we kind of see you get closer and closer to
15    the tunnel and kind of get in there at some point.  What
16    exactly happened?
17    A.  Well, initially, when we got to the tunnel, I back up a
18    little bit.  You know, nothing was happening.  Obviously,
19    you know, the police were there.  Obviously, you know,
20    nobody was supposed to enter the Capitol Building.  I knew
21    that.  Everybody should have known that.
22         And so -- you know, I wanted to take a few
23    pictures of the whole scene, so I did.  And then the crowd
24    tightened up behind me.  And before long, you know, you were
25    being jostled.  And then before long, you know, things just
```

1    went to hell and I was pushed in the tunnel.

2    Q.  Did -- I guess, was it -- let me say it this way:  Were

3    there some people getting violent at this point?

4    A.  Yeah.  Uh-huh.

5    Q.  And was it your intent to inflict any violence?

6    A.  Pardon?

7    Q.  Was it your intent to inflict any violence on anyone?

8    A.  No.  That was not my intent.

9    Q.  You're outside the tunnel.  You get pushed in, is what

10   you've testified to.  Is Mr. Pavlik still in there?

11   A.  Yes.

12   Q.  Okay.  Did you see him in there?

13   A.  I did see him in there.

14   Q.  And -- so you're in this tunnel.  What exactly -- what

15   exactly are you trying to do while in there?  We've seen the

16   videos.  What is going on?

17   A.  Well, I see that Pavlik has got his hands up, like this.

18   I see that he's being pressed between the cops and the

19   people behind him.  He's, you know, three or four people in

20   front of me.  And, you know, it's complete chaos in there

21   when the pepper spray starts going.

22   Q.  Okay.  So how packed was it in that tunnel?

23   A.  I'm sorry?

24   Q.  How packed was it in that tunnel?

25   A.  It was pretty packed.  I mean, it was -- it was packed.

```
1    Q.  Was it easy to leave at that point?

2    A.  No.  There were people pushing behind.  There was -- I

3    couldn't leave if I wanted to.

4    Q.  And obviously, there's law enforcement in front of you.

5    Are they just backing up or are they pushing forward?

6    A.  Pardon me?

7    Q.  Law enforcement is in front of you.  Are they backing up

8    or are they pushing forward?

9    A.  My perception is they were pushing forward.

10   Q.  So it's both sides --

11   A.  Pushing against, yeah.

12   Q.  And you were caught in the middle of all that?

13   A.  Uh-huh.

14            THE COURT REPORTER:  Is that a yes?

15            THE WITNESS:  Correct.

16   BY MR. FLYNN:

17   Q.  You've got to answer yes or no.

18            At some point, were you pepper-sprayed?

19   A.  Oh, absolutely.

20   Q.  Okay.  Now, if you could describe the effect of the

21   pepper spray that it had on you as we've seen in these

22   videos the Government has put into evidence.  What

23   exactly -- what effect did it have on you?

24   A.  It had a bad effect on me.  You know, the testimony

25   before -- Neville, you know, he described it.  You know, I
```

1    Q.  Okay.

2                MR. FLYNN:  Go ahead and shut it down.

3                THE COURT:  What exhibit number was all this?

4                MR. FLYNN:  This -- 119-A.1.  119-A.1, your Honor.

5                THE COURT:  Thank you.

6    BY MR. FLYNN:

7    Q.  Mr. Crowley, at some point, there was a second time that

8    you went into the tunnel or were pushed into the tunnel.  Is

9    that correct?

10   A.  That's correct.

11   Q.  Were you still on that mission of pulling out Pavlik at

12   this point?

13   A.  I wasn't on the mission.  I just -- I had enough of that

14   I could stand.  More than that.

15   Q.  Okay.

16   A.  That was just -- the last thing I wanted to do was get

17   sprayed again.

18   Q.  Okay.

19   A.  I was trying to tell Ben where I last saw Pavlik.

20   Q.  Okay.  How did you get back into the tunnel?

21   A.  I was pushed in from behind.

22   Q.  Okay.  And once again, is this kind of a large group of

23   people there pushing you into this?

24   A.  It was -- it was -- as Foulds said, it was a mass human

25   surge.

1    Q.  And was it easy to get out of the tunnel at that time?

2    A.  Again, I was getting pepper-sprayed.  You know, again, I

3    couldn't see.  There were people all around, you know, boxed

4    in like this.

5            So there was -- there was nothing you could do.

6    Just put your head down and pray --

7    Q.  Okay.

8    A.  -- to get out.

9    Q.  Did the effects of the pepper spray still have an

10   effect -- let me rephrase the question.

11           Were the effects of the pepper spray still

12   prevalent when you made that second entry into the tunnel,

13   when you were pushed in?

14   A.  Yeah.  I mean, I had -- I had the effects.  I was

15   treated by Bensch down there after I was talking to -- or

16   while I was talking to Ben about Pavlik.  Bensch had the

17   foresight to bring something to wash my eyes and face off

18   with.

19   Q.  Were you sprayed again the second time you got into the

20   tunnel?

21   A.  I was sprayed again.

22   Q.  And same effects as the first time?

23   A.  Same effects.

24   Q.  Okay.  Couldn't see anything?

25   A.  Couldn't see anything.

1    Q.  Okay.  And it wasn't easy to get out of there for you,

2    was it?

3    A.  No.  There was no getting out until the people behind

4    you moved --

5    Q.  And eventually --

6    A.  -- so --

7    Q.  Go ahead.

8    A.  So the people behind had to get sprayed and those behind

9    them had to get sprayed in order to motivate them to move,

10   is my line of thinking.  But those of us in the tunnel, we

11   were boxed in.

12   Q.  Okay.  Did you leave the tunnel after that second

13   time --

14   A.  I did.

15   Q.  -- you went in?

16            And where did you go after you were able to get

17   out?

18   A.  I went back down to the steps and reconvened with Ben.

19   Q.  Were the effects of pepper spray still prevalent?

20   A.  Yes.

21   Q.  Was Ben able to get Mr. Pavlik out?

22   A.  He was not.

23   Q.  Were you able to get Mr. Pavlik out?

24   A.  No.

25   Q.  Did you at any point head back towards the tunnel?

1    A.  I did.

2    Q.  Okay.  And what was going on?

3    A.  Well, I was talking to Ben, and then someone came and

4    said there was a guy that was stabbed by a flagpole on

5    the -- as you approach the tunnel, there's, I guess, wide

6    steps with rails on them to the right.  And his location,

7    his approximate location, was there.

8            So in order to access that, you had to go up

9    towards the tunnel.

10   Q.  Okay.  On the way up towards that area, were you hit by

11   pepper spray again?

12   A.  I was.  Uh-huh.  Yeah.

13   Q.  And did it have an effect on you again?

14   A.  It did.

15   Q.  Same sort of effects as last time?

16   A.  Same effect.

17   Q.  Okay.  Where did you go for that?  Where did you go?

18   A.  What do you mean?

19   Q.  Where did you go when you -- after the pepper spray?

20   A.  Oh.  I just leaned over the rail and was talking to --

21   or listening to a guy talk to me, you know, by the rail.

22   Q.  Okay.  And I guess -- how were you feeling?  What was

23   your -- what effect did the pepper spray have on you?

24   A.  It had a horrible effect.  It was painful.  It was

25   nauseating.  It was burning.

```
1    Q.  Were you able to find Mr. Pavlik while you were up
2    there?
3    A.  You know, when I peeked in before I went to the right, I
4    didn't see him.  But then I was blasted by pepper spray and
5    so I wasn't able to see.
6    Q.  You said a moment ago that the reason you went up there
7    is because somebody had been injured by a flagpole.
8    A.  Right.
9    Q.  Did you ever get to that person?
10   A.  I never got to that person.  Right.
11   Q.  Did you decide to leave at that point?
12   A.  I did.
13   Q.  Okay.  Now, the Government on their case has said that
14   you were holding an item in your hand at that point.
15   A.  Right.
16   Q.  Do you recall that testimony and that --
17   A.  Excuse me?
18   Q.  Do you recall that video?
19   A.  I do.
20   Q.  Okay.  What was that item in your hand?
21   A.  That was a tourniquet holder.
22   Q.  Okay.  And what is a tourniquet holder made out of?
23   A.  Plastic.  Hard plastic.
24   Q.  And why is it -- why do you have a holder for a
25   tourniquet?
```

1    A.  Well, it's a string tourniquet.  So the way you stage a

2    tourniquet is important in order to get to the victim.

3    Staging is -- you can release the tourniquet properly so it

4    doesn't get tangled up.  So you fold the string tourniquet

5    and insert it into the -- into the PVC tube.

6    Q.  Okay.

7    A.  So when you pull it out, it's not tangled up.

8    Q.  Readily accessible?

9    A.  Correct.

10   Q.  Okay.  Where did you all go after you walked down from

11   that -- the top near the tunnel?

12   A.  Let's see.  We were leaving Capitol grounds.  We went, I

13   guess, the west -- I don't know what direction that would

14   be.  Wherever the police line in the video showed, we went

15   there and then we left.  We thought we could exit that way,

16   but then we saw we could exit another -- towards the west.

17   Q.  You just said where the police line was in that video.

18          Are you talking about --

19   A.  I'm sorry.  Down -- down -- I'm sorry.  Down on the

20   ground, the video that's very far away, the last video where

21   Bensch administers more milk in my eye.

22   Q.  You're referring where the police line was at one point,

23   but it wasn't where --

24   A.  They had -- I guess they had established a line there.

25   Q.  Okay.

Crowley - DIRECT - By Mr. Flynn

```
1    A.  They were in front of some -- what looked like azaleas
2    in front of a landscaped area.
3    Q.  So this was after the incident.  They weren't there when
4    you entered the grounds, were they?
5    A.  What's that?
6    Q.  This is after all this incident, after you went up to
7    the --
8    A.  Correct.
9    Q.  The police line was not there when you went into the
10   Capitol.
11   A.  I don't know, because I didn't go to that area.
12   Q.  Okay.  It was a different area than when you came --
13   A.  A different area that I came in on.  It was more towards
14   the back of, I believe, the Capitol.
15   Q.  Okay.
16           MR. FLYNN:  If I could just have a moment, your
17   Honor.
18           THE COURT:  You may.
19           MR. FLYNN:  (Confers with co-counsel privately.)
20   BY MR. FLYNN:
21   Q.  Mr. Crowley, one of the videos that the Government put
22   into evidence yesterday shows somebody kind of dropped down
23   on you from a higher point.
24           Do you recall that incident?
25   A.  Yeah.  Mr. Paratrooper.  Yeah.
```

```
 1    Q.  And describe for us -- what exactly was going on there?
 2    A.  Chaos.  I had no idea.  I mean, I had people surrounding
 3    me on all sides of me.  And then I got this -- this
 4    fellow -- excuse me -- this fellow dropping down on top of
 5    me.
 6    Q.  Okay.  And did you -- it was suggested in testimony that
 7    you assisted this person in stabilizing himself.  Is that
 8    the case?
 9    A.  That was not the case.  I was trying to bat him off,
10    trying to get him off my shoulder.  Maybe it was this hand;
11    I don't know.
12    Q.  Could you move away from him?
13    A.  I couldn't move.  I could not move away from him.  He
14    was on top of me.  People were all around me.  You know, he
15    was stomping me.  He kicked me.  He kicked me in the face.
16    Not appreciated.  He kept, you know -- kept moving, kept
17    stomping on my shoulders.  You know, he probably weighed 200
18    pounds, and it was not comfortable.  It was painful.
19    Q.  Okay.  He elicited pain from you when he did that?
20    A.  Oh, absolutely.
21    Q.  Okay.  It's alleged that you took your hand and grabbed
22    some part of his body.  Do you recall --
23    A.  Right.
24    Q.  -- doing that?  Do you recall doing that?
25    A.  I do.
```

Crowley - DIRECT - By Mr. Flynn

1    Q.  Okay.  Why did you do that?

2    A.  To get him off me.

3    Q.  Okay.  It wasn't to stabilize him to allow him to --

4    A.  No.  Absolutely not.

5            THE COURT:  Sir, you need to let him finish.

6    BY MR. FLYNN:

7    Q.  It wasn't to stabilize him to allow him to attack law

8    enforcement officers?

9    A.  Absolutely not.

10   Q.  Thank you.

11           Your hand was up, though, while this was happening

12   for two to three seconds.

13           Was it easy to get him off you?

14   A.  No.

15   Q.  It was rather difficult?

16   A.  It was difficult.

17   Q.  There was a point we talked about a few moments ago --

18   and I forgot to mention the video that the Government has

19   put into evidence.  You said you met up with Ben Cole after

20   your first time in the tunnel.

21           Do you recall testifying to that?

22   A.  Can you say that again?

23   Q.  You met up with Ben Cole after your first time in the

24   tunnel trying to get Mr. Pavlik.

25           Do you recall testifying to that?

1    A.  Just a few minutes ago.  Correct.

2    Q.  Okay.  The video the Government showed shows you, I

3    guess, gesturing your hand towards yourself.

4              Do you recall that video?

5    A.  I do.

6    Q.  Okay.  What were you doing there?

7    A.  I was calling the other members of our group to come

8    help --

9    Q.  Okay.

10   A.  -- you know, because I thought they were down there.

11   Q.  Help do what?

12   A.  Get Pavlik and the other member out.

13   Q.  Okay.

14             MR. FLYNN:  One moment, your Honor.

15             (Confers with co-counsel privately.)

16   BY MR. FLYNN:

17   Q.  Now, briefly, Mr. Crowley, were you wearing a vest that

18   day?

19   A.  I was.

20   Q.  Okay.  Did the vest have any plating in it?

21   A.  No.  Not that day.

22   Q.  Why not?

23   A.  It's 36 pounds.  That's a lot of weight.  I was tired

24   of -- we had walked, it seemed like forever, that morning to

25   get to the Ellipse.  I knew walking to the Capitol was a

1    distance, so I wanted to lighten my load.

2    Q.  Did you remove -- did you bring plates with you?

3    A.  I did bring plates.

4    Q.  You removed them, though?

5    A.  I removed them.

6            THE COURT:  When?

7            THE WITNESS:  At the hotel.

8            THE COURT:  So beforehand?

9            THE WITNESS:  Beforehand, yeah.  Uh-huh.  Correct.

10            THE COURT:  So you knew you were going to be

11    walking to the Capitol?

12            THE WITNESS:  I knew I was going to be walking to

13    the Capitol.  Correct.

14            THE COURT:  Okay.

15            THE WITNESS:  Yeah.

16    BY MR. FLYNN:

17    Q.  Did you have any weapons on you that day?

18    A.  No.

19    Q.  Was it your intent to inflict any violence on any law

20    enforcement officers?

21    A.  No.

22            MR. FLYNN:  I have no further questions.

23            THE COURT:  Thank you.

24            MR. ONTELL:  Your Honor, the Government would ask

25    for a lunch recess, your Honor.

```
1              THE COURT:  You can begin.  We'll stop in about
2      ten minutes.
3              MR. ONTELL:  Okay, your Honor.  That would be
4      good.
5              THE COURT:  You can get started.
6                         CROSS-EXAMINATION
7      BY MR. ONTELL:
8      Q.  Good afternoon, Mr. Crowley.  How are you?
9      A.  I'm all right.  How are you?
10     Q.  I'm all right.  Thank you.
11     A.  Good.
12     Q.  Mr. Crowley, on January 6th, 2021, you were an adult, 50
13     years old.  Right?
14     A.  I'm sorry?
15     Q.  You were an adult of 50 years old.  Right?
16     A.  Thanks for reminding me.  Yes.
17     Q.  And as an adult of 50 years old, you have free will.
18     True?
19     A.  Correct.
20     Q.  You can do what you want to do.
21     A.  I'd like to think that.
22     Q.  And you believe in personal responsibility.  True?
23     A.  Correct.
24     Q.  And no one forces you to do something as a 50-year-old
25     male.  Right?
```

Crowley - CROSS - By Mr. Ontell

```
 1    A.  The government forces me to pay taxes.  So...

 2    Q.  Well, besides the government forcing you to pay taxes.

 3    A.  I'll placate you.  Yes.  Correct.

 4    Q.  Now, I want to talk a little bit about the Guardians of

 5    Freedom here.

 6         You said that you were a new member.  True?

 7    A.  No.  I was not a member.

 8    Q.  Oh, I'm sorry.  You were a probationary person

 9    interested in being a member.

10    A.  I wouldn't say probationary period.  But I was

11    interested in being a member.

12    Q.  So what you did is you got in a car on January 5, 2021.

13    True?

14    A.  It was a van.

15    Q.  Got in a van.  Right?  With people that you didn't

16    really know that well.

17    A.  Correct.

18    Q.  In fact, you didn't even know the name of one of the

19    people that you were speaking with on January 6th.  Right?

20    Your counsel had to remind you.

21    A.  Correct.

22    Q.  And you got in a van with these people that you barely

23    knew and drove approximately 12 hours to Washington, D.C.

24    True?

25    A.  Correct.
```

Crowley - CROSS - By Mr. Ontell

```
 1    Q.  And with these people whom you barely knew, you stayed

 2    in a hotel.  True?

 3    A.  Correct.

 4    Q.  You didn't even have your own room.  Right?

 5    A.  Pardon me?

 6    Q.  You did not have your own room.  Right?

 7    A.  No.  I had a roommate.

 8    Q.  You had a roommate.

 9              And this roommate was another member of the

10    Guardians of Freedom.  Right?

11    A.  Correct.

12    Q.  And you had a packing list.  True?

13    A.  Yes.

14    Q.  And this packing list said face mask to secure your

15    identity.  Right?

16    A.  That's what the packing list said.

17    Q.  A little bit concerning.  No?  Why would you need to

18    secure -- I mean, just thinking about it, did you ever ask

19    yourself, Why do I need to secure my identity?

20    A.  I did ask that question to the members.  And they said

21    that --

22    Q.  Sir, the question was a yes-or-no question.  Did you

23    ever consider that?

24    A.  I did.

25    Q.  And after considering that, you still got in a van and
```

Crowley - CROSS - By Mr. Ontell

1    A.   Correct.

2    Q.   And during that time -- you just finished testifying

3    that the person who was hitting the stick against the shield

4    at 3:55, that's when things started to become chaotic.

5    Right?

6    A.   They were chaotic before.

7    Q.   They were chaotic before.   When did they get chaotic,

8    sir?

9    A.   A few minutes before.

10   Q.   A few minutes before?

11   A.   Yeah.   I was on one side of the tunnel and I got pushed

12   into the -- to the middle of the tunnel, whenever that was.

13   Q.   So, sir, 3:55 is when the person was smashing the stick

14   against the shield.   Correct?

15   A.   If you say so.

16   Q.   And then -- and the reason I say so is because we just

17   watched the video showing it.

18   A.   (No response.)

19   Q.   Do you want me to pull it up again?

20   A.   That's not necessary.

21   Q.   Okay.   And you said -- you're now saying things were

22   chaotic before then.   Right?

23   A.   Say again.

24   Q.   Things were chaotic before 3:55.   Right?

25   A.   My perception, they got chaotic.

Crowley - CROSS - By Mr. Ontell

```
1    A.  See what?

2    Q.  See his forehead.

3    A.  What about it?

4         MR. ONTELL:  Mr. Clements, can you zoom in on the

5    individual's forehead.

6         THE WITNESS:  Yes.

7    BY MR. ONTELL:

8    Q.  That person has an injury, doesn't he?

9    A.  Yes.

10   Q.  And you just testified that the entirety of your time at

11   the tunnel you did not administer first aid at all.

12   Correct?

13   A.  Correct.

14   Q.  You didn't offer to administer first aid to this

15   individual?

16   A.  I did.

17   Q.  Sir, I said:  Did you offer to administer first aid to

18   this individual?

19   A.  I talked to him, yes.  I said, What's wrong with your

20   head?

21   Q.  Okay.  Sir, that's not the question I asked.

22         Did you administer first aid to this --

23   A.  No.  I did not administer first aid.

24   Q.  Thank you.

25   A.  I offered.
```

Crowley - CROSS - By Mr. Ontell

1          MR. ONTELL:  Mr. Clements, can you continue

2     playing.

3          (Whereupon, segments of Government's Exhibit

4     No. 108 were published in open court.)

5          MR. ONTELL:  Let's pause.

6     BY MR. ONTELL:

7     Q.  The individual standing next to you is Mr. Pavlik, who

8     wore the gas mask.  Right?

9     A.  I believe that's him.

10    Q.  You said he led you to the tunnel.  Correct?

11    A.  Yes.

12    Q.  We started playing at 5:40.  It's now 6:24.  Did you see

13    Mr. Pavlik in any of the prior 45 seconds of footage?

14    A.  No.

15    Q.  But you were led there by Mr. Pavlik.  Right?

16    A.  Yes.  I was led to the tunnel by Mr. Pavlik.  He wasn't

17    in the lead all the time.

18    Q.  There was times when you were in the lead.

19    A.  Yes.

20    Q.  And the reason you were in the lead is because you knew

21    where to go.

22    A.  Well, I'm a medic.  I go to where things -- where I may

23    be needed.

24    Q.  You go where you may be needed.  And a medic is needed

25    where there are injuries.  Right?

1    A.  Correct.

2    Q.  You walked 25 minutes from the lower west -- from the

3    northwest lawn to the lower west terrace tunnel in a chaotic

4    atmosphere.  People are climbing banisters.  Right?

5    A.  Yeah.

6    Q.  And not one person needed any kind of --

7    A.  I did not see --

8              THE COURT:  Sir, you need to let him finish the

9    question.

10   BY MR. ONTELL:

11   Q.  You didn't administer aid once that entire time.

12   Correct?

13   A.  I did not see a need to administer aid one time.

14   Q.  You were going to the area where there was a need for

15   aid, where there was violence.  Right?

16   A.  That's where we ended up.

17   Q.  Yeah.  You ended up there because you needed to

18   administer aid where there was violence.  That's where a

19   medic is needed.  True?

20   A.  That's where medics are needed.

21   Q.  And you said you were a special kind of medic.  Right?

22   A.  I'm not a special kind of medic.  I'm -- I didn't imply

23   that.

24   Q.  No.  You're not a special kind of medic.  You're a

25   landscape architect.  Right?

1    A.  Correct.

2    Q.  But you said you were a medic.  Right?

3    A.  That term is used loosely.

4    Q.  A term that you use loosely to describe yourself.

5    A.  I can perform medical procedures on people.

6    Q.  The reason you said you could perform medical procedures

7    on people is because you consider yourself a medic.

8    A.  Correct.

9    Q.  And you have training as a medic.

10   A.  That is correct.

11   Q.  Training to administer wounds, serious wounds.  True?

12   A.  Serious and minor.

13   Q.  Puncture wounds.

14   A.  Correct.

15   Q.  And that's the medical gear that you brought with you on

16   January 6th, 2021.

17   A.  Correct.

18           MR. ONTELL:  Mr. Clements, can you continue

19   playing.

20           (Whereupon, segments of Government's Exhibit

21   No. 108 were published in open court.)

22           MR. ONTELL:  Pause here.

23   BY MR. ONTELL:

24   Q.  So it's your testimony here that it's so tight at this

25   point -- and we've watched now a minute -- that you could

```
 1    barely turn around.  Right?
 2    A.  No.  Not at this point.
 3    Q.  Not at this point.  At this point, you could have left
 4    if you wanted to.  Right?
 5    A.  Yeah.
 6    Q.  And Mr. Pavlik is right next to you?
 7    A.  Right.
 8    Q.  Not in the tunnel?
 9    A.  Not in the tunnel.
10    Q.  Not in any kind of danger?
11    A.  Huh-uh.
12              THE COURT REPORTER:  Is that a no?
13              THE WITNESS:  I'm sorry.  That's correct.  That's
14    a no.
15    BY MR. ONTELL:
16    Q.  By the way, Mr. Pavlik has a gas mask, doesn't he?
17    A.  Yes.
18    Q.  Didn't you say that getting sprayed was one of the most
19    painful experiences of your entire life?
20    A.  I didn't hear you.
21    Q.  Didn't you say that getting sprayed was one of the most
22    painful experiences of your entire life?
23    A.  Yes.
24    Q.  And you went into a tunnel not once, not twice, to help
25    an individual that you barely knew.  You don't even know
```

1    what he did for a living.  Right?

2    A.  Correct.

3    Q.  Who had a gas mask on.

4    A.  I didn't expect --

5    Q.  Sir, the question was, who had a gas mask on.  Right?

6    A.  Pardon me?

7    Q.  He had a gas mask on.  Correct?

8    A.  Pavlik had a gas mask on.

9    Q.  A gas mask is very helpful when you are in an area with

10   high levels of chemical spray.  True?

11   A.  That is true.

12   Q.  You didn't have a gas mask.

13   A.  That is correct.

14           MR. ONTELL:  Mr. Clements, can you press play

15   again.

16           (Whereupon, segments of Government's Exhibit

17   No. 108 were published in open court.)

18   BY MR. ONTELL:

19   Q.  Mr. Pavlik is still not in the tunnel.  Right,

20   Mr. Crowley?

21   A.  I'm sorry?

22           MR. ONTELL:  Press pause.

23   BY MR. ONTELL:

24   Q.  Mr. Pavlik is still not in the tunnel.  Correct,

25   Mr. Crowley?

1    A.  Could you go back a second?

2    Q.  Sure.

3            MR. ONTELL:  Go back a little further,

4    Mr. Clements.  Another second.

5            (Whereupon, segments of Government's Exhibit

6    No. 108 were published in open court.)

7    BY MR. ONTELL:

8    Q.  Do you see Mr. Pavlik?

9    A.  No.  He's not in the tunnel.

10           MR. ONTELL:  Could you continue, Mr. Clements.

11           (Whereupon, segments of Government's Exhibit

12   No. 108 were published in open court.)

13           MR. ONTELL:  You can pause it here, Mr. Clements.

14   BY MR. ONTELL:

15   Q.  You saw this individual before he hung into the entrance

16   of the tunnel.  Correct?

17   A.  Pardon me?

18   Q.  You were standing in a position where you could see this

19   person hanging right here right now?

20   A.  The video shows that.  Yes.

21   Q.  And the reason the video shows it is because it's true.

22   Right?

23   A.  That's true.

24           MR. ONTELL:  Can you press play, Mr. Clements.

25           (Whereupon, segments of Government's Exhibit

1   No. 108 were published in open court.)

2          MR. ONTELL:  Pause right there.  Can you go back

3   just another second so we can see Mr. Crowley -- where he's

4   now lifting his hat slightly above his hand.  Can you maybe

5   do it frame by frame?

6          (Whereupon, segments of Government's Exhibit

7   No. 108 were published in open court.)

8          MR. ONTELL:  Pause right there.

9   BY MR. ONTELL:

10   Q.  It's kind of weird to see someone hanging from the

11   entrance of a tunnel.  Right?

12   A.  Come again?

13   Q.  It's kind of weird to see someone hanging from the

14   entrance of a tunnel.  Right?

15   A.  There were a lot of weird things that day.

16   Q.  Weird things.  But you stayed, still.  Right?

17   A.  Pardon me?

18   Q.  You still haven't tried to leave at this point, have

19   you?

20   A.  It's a zoo.

21   Q.  Sir, my question wasn't if it's a zoo or not.

22          My question was:  Did you try to leave?

23   A.  Not at this time.

24   Q.  Thank you.

25          MR. ONTELL:  You can continue playing,

1    Mr. Clements.

2              THE WITNESS:  He may have fell and I may -- I

3    could have offered assistance medically.

4    BY MR. ONTELL:

5    Q.  You stayed because you wanted to offer medical

6    assistance.  Is that what your testimony is?

7    A.  I could have offered medical assistance if he fell.

8    Q.  Sir, my question is:  You stayed in this area because

9    you wanted to offer medical assistance.  Right?

10   A.  I could offer medical assistance.  Did --

11   Q.  You could --

12   A.  -- I want to?  No.

13   Q.  And -- well, you're a medic.  Correct?

14   A.  That's the term we're using.  Correct.

15   Q.  That's the term you used to describe yourself on direct

16   examination.

17   A.  Correct.

18   Q.  You wanted -- you said you led the way because you

19   wanted to be where the violence was so you could provide

20   medical care.  Right?

21   A.  No.  Pavlik led the way.

22   Q.  Sir --

23   A.  Even though --

24   Q.  -- are you saying now that there wasn't some times you

25   led the way?  Didn't you say just now there were some

```
 1    times --
 2    A.  Pavlik led the --
 3              THE COURT:  Wait.  Sir, you need to let him finish
 4    the question.
 5              And then you need to let him finish the answer,
 6    Mr. Ontell.
 7              All right.  Mr. Ontell.
 8              MR. ONTELL:  Sorry, your Honor.
 9    BY MR. LaFAY:
10    Q.  Didn't you just say that there were some times where you
11    led the way to the tunnel because you were a medic and you
12    wanted to go where the violence was?
13    A.  Pavlik led the way for the majority of the time.  There
14    was a little bit of time I may have led the way.  So yeah,
15    sometimes.
16    Q.  So the answer is yes?
17    A.  Yes.
18    Q.  And you were there -- the reason you're saying you
19    stayed now is because this person could have fallen and
20    needed care.  Correct?
21    A.  He could have fallen.  Right.
22    Q.  You felt your services would be needed.  Correct?
23    A.  Correct.
24    Q.  And that's why you didn't turn around and leave at this
25    point.
```

```
1    A.  Anything could have happened.
2    Q.  Sir, I'm asking you to say what you just said.  Are you
3    changing your testimony?
4    A.  I'm not changing my testimony.  But if -- I was there.
5    He could have fallen.  I could have offered medical
6    assistance.
7    Q.  And that's why you didn't try to leave.  Right?
8    A.  Somebody else could get injured and I would have offered
9    medical assistance.
10   Q.  There's a pending question.  Did you hear what it was?
11   A.  Pardon?
12   Q.  Sir, the reason you said you didn't leave at this time
13   is because you said this person could have fallen and might
14   need care.  True?
15   A.  That was not my primary reason for not leaving at that
16   time.  Anyone could have gotten hurt.
17   Q.  Sir --
18   A.  He's included in that.
19   Q.  The reason you didn't leave is because you wanted to be
20   able to offer your services for medical care.  True?
21   A.  To anyone that --
22           MR. FLYNN:  Objection, your Honor.  This question
23   has been asked five ways.  And he's answered --
24           THE COURT:  I agree.  Sustained.
25           MR. ONTELL:  Mr. Clements, can you press play.
```

```
 1                    (Whereupon, segments of Government's Exhibit
 2      No. 108 were published in open court.)
 3                    MR. ONTELL:  Stop at 8:10, please.
 4      BY MR. ONTELL:
 5      Q.  Sir, you were talking earlier about plates.  True?
 6      A.  About what?
 7      Q.  Plates.
 8      A.  Plates.
 9      Q.  Yes.
10      A.  Correct.
11      Q.  Armor -- specifically body armor?
12      A.  Correct.
13      Q.  And body armor appeared on the packing list.
14      A.  Correct.
15      Q.  You were doing security at the rally earlier in the day.
16      A.  That is correct.
17      Q.  And when you were planning on going, you had no notion
18      that you were going to need to go to the U.S. Capitol.
19      Correct?
20      A.  Can you repeat the question?
21      Q.  Sure.
22                    When you were planning your trip, you had no
23      notion that you would go to the Capitol Building.  Correct?
24      A.  That is correct.
25      Q.  You only knew that you were going to do security at the
```

1    Ellipse.  Correct?

2    A.  That is correct.

3    Q.  And you saw a packing list.

4    A.  Correct.

5    Q.  The packing list said bring body armor.

6    A.  Yes.

7    Q.  You brought body armor.

8    A.  Yes.

9    Q.  But you testified earlier that you couldn't wear the

10   body armor at the Ellipse.  Right?

11   A.  That is correct.

12   Q.  So you had a packing list -- withdrawn.

13           But then you returned to your hotel?

14   A.  Yes.

15   Q.  You got a tactical -- a belt.  Excuse me.  You got a

16   belt.

17   A.  The medical belt.

18   Q.  You got a belt.  True?

19   A.  The medical belt.

20   Q.  You'll call it a medical belt.

21   A.  Correct.

22   Q.  But you got it.  Right?

23   A.  Correct.

24   Q.  But you didn't get the armor that was on the packing

25   list when you went back to your hotel before going to the

1    Capitol Building.  Right?

2    A.  Repeat the question.

3    Q.  You didn't get the armor that you brought to the

4    Capitol -- brought to D.C. before going to the Capitol.

5    Right?

6    A.  That's correct.

7    Q.  So you didn't use armor at all the entire time you were

8    in Washington, D.C.  Right?

9    A.  I did not.

10   Q.  But you brought it with you.

11   A.  I brought it with me because it -- I was told to.

12   Q.  Just to note, Mr. Crowley, you don't have any

13   deformities on your back by any chance?

14   A.  No.

15   Q.  No bulges?

16   A.  No.

17          MR. ONTELL:  Mr. Clements, can you pull up 107 at

18   6:49.

19          (Whereupon, segments of Government's Exhibit

20   No. 107 were published in open court.)

21          MR. ONTELL:  Pause right there.

22   BY MR. ONTELL:

23   Q.  Mr. Crowley, this is you?

24   A.  That's correct.

25   Q.  And that's your back right there.  Right?

Crowley - CROSS - By Mr. Ontell

```
1    A.  That is correct.

2    Q.  You said you were on the -- at the Capitol in

3    Washington, D.C., to do security.  Right?

4    A.  That is correct.

5    Q.  Safety is paramount to someone who is interested in

6    security.  Right?

7    A.  Can you say that again?

8    Q.  Safety is paramount as someone who is interested in

9    security.

10   A.  Yes.

11   Q.  Including bodily safety.  Right?

12   A.  Correct.

13   Q.  You don't want anyone to get hurt.

14   A.  That's correct.

15   Q.  You don't want anyone to punch anyone.

16   A.  No.

17   Q.  Anyone to kick anyone.

18   A.  No.

19   Q.  Pushing is not okay.  Right?

20   A.  Pushing is not okay.

21   Q.  Shoving is not okay?

22   A.  Correct.

23   Q.  If something like this happens, you were with a group of

24   people, the Guardians of Freedom.  Right?

25   A.  Pardon?
```

Crowley - CROSS - By Mr. Ontell

1    Q.  You were with the Guardians of Freedom.  Right?

2    A.  Correct.

3    Q.  You call for backup if you need backup and something

4    gets violent.  Right?

5    A.  Well, I don't know the situation where I would call

6    backup.

7    Q.  But you would react in some way if something [sic] was

8    being violent as a security officer.  Right?

9    A.  At the Ellipse?

10   Q.  Yeah.

11   A.  I was more of an usher than anything.

12   Q.  So on direct examination, you said you were going for

13   security.  Right?

14   A.  Well, they -- we were led to believe that we would

15   provide security at the Trump rally.  Some of the members

16   did provide security.  I was not one of the members.

17   Q.  So you were duped?

18   A.  No.

19   Q.  So either you were providing security or you were going

20   to be an usher.  Which one was it?

21   A.  It was --

22          MR. FLYNN:  Objection, your Honor.  He's answered

23   this question.

24          THE COURT:  Sustained.

25          THE WITNESS:  It was a tossup --

Crowley - CROSS - By Mr. Ontell

```
 1              THE COURT:  Sir, you don't need to answer that
 2     question.
 3              You may ask another one.
 4              MR. ONTELL:  I'll move forward.
 5     BY MR. ONTELL:
 6     Q.  And part of being security is working with police?
 7     A.  Yes.
 8     Q.  And your job is to cooperate with police?
 9     A.  Security's job is to cooperate with police.
10     Q.  And of course, as a member of security, you would do
11     that, cooperate with police.
12     A.  Correct.
13     Q.  And if -- you're now a leader in the Guardians of
14     Freedom?
15     A.  Not anymore.  But at one time I was.
16     Q.  And when you were a leader in the Guardians of Freedom,
17     if someone was pushing or shoving police officers, you
18     wouldn't like that.  Right?
19     A.  No.
20     Q.  You would say, You've got to get this guy out of here --
21     A.  That's correct.
22     Q.  -- right?
23     A.  That's correct.
24     Q.  That's not what you guys are about.
25     A.  No.  We're not.  Not anymore.
```

1    Q.  Well, at one time you were.

2    A.  When I was a leader, yeah.

3    Q.  I'm going to go back.

4    A.  It was cleaned up.  Guardians of Freedom was cleaned up.

5    Q.  And when Guardians of Freedom -- when you were a leader,

6    you guys were not about pushing or being noncooperative with

7    police.  Right?

8    A.  Correct.

9    Q.  By the way, the Ellipse is approximately a mile away

10   from the U.S. Capitol.  Correct?

11   A.  I'm assuming.  It's a long way for me.

12   Q.  Well, you walked there.  Right?

13   A.  Yeah.

14   Q.  You're a pretty smart guy.

15   A.  I would like to think so.

16   Q.  You estimate that -- you can estimate a distance?

17   A.  Pardon me?

18   Q.  You can estimate a distance?

19   A.  To a degree.

20   Q.  Was it --

21   A.  But it's like time.  It's something I don't -- I

22   don't -- it's not easy for me to comprehend.

23   Q.  Time is a difficult concept.  I understand.

24            It was approximately -- it was more than a mile

25   away --

Crowley - CROSS - By Mr. Ontell

1                          **CERTIFICATE**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8

9

10                   Dated this 19th day of November, 2023.

11

12            /s/ Lisa Edwards, RDR, CRR
              Official Court Reporter
13            United States District Court for the
                District of Columbia
14            333 Constitution Avenue, Northwest
              Washington, D.C. 20001
15            (202) 354-3269

16

17

18

19

20

21

22

23

24

25