UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

        Plaintiff,

v.                           CASE NUMBER: 1:23-cr-00045-TNM

JOHN EDWARD CROWLEY,

        Defendant.

_____/

## DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR A DOWNWARD VARIANCE

COMES NOW, the Defendant, John Edward Crowley, pursuant to 18 U.S.C. §3553(a), respectfully submits this Sentencing Memorandum in support of his request for this Honorable Court to exercise its discretion and impose a sentence below the advisory guideline range contained within the Presentence Report (PSR) in this case.

At the time of filing, Mr. Crowley has submitted his objections, additions, and corrections to errors regarding the Mr. Crowley's PSR. The Addendum has not been released.

## Introduction

On October 16, 2023, Mr. Crowley's bench trial began before the Honorable Judge Trevor McFadden. On October 18, 2023, Mr. Crowley was found guilty of: Count 1: Civil Disorder under 18 U.S.C. § 231(a)(3); Count 3: Submission of a False Claim under § 18 U.S.C. §287; Count 6: Disorderly and Disruptive Conduct in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(2), 1752(b)(2).; and Count 12: Impeding Passage Through the Capitol Grounds or Buildings 40 U.S.C. §§ 5104(e)(2)(E), 5109(b). (PSR ¶4) Mr. Crowley, who has no significant criminal record, is facing an advisory sentencing guideline range of 18 months to 24 months

1

incarceration (total offense level 15, criminal history category I). (PSR ¶101) Additionally, he faces up to three (3) years of Supervised Release per count. (PSR ¶103)

By exercising their discretion to permit a downward variance, the Court would be providing a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing under 18 U.S.C. § 3553(a).   A sentence that includes a downward variance will satisfy the statutory goals of sentencing and will constitute a sentence that reasonably provides a just punishment, protects the public, promotes respect for the law, affords adequate deterrence and promotes rehabilitation as outlined in 18 U.S.C. §3553(a)(2). Based on the criteria set forth in § 3553, and its parsimony clause, Mr. Crowley submits that a downward variance is the sole means of achieving a reasonable sentence.   The 'reasonableness' of a sentence is, of course, determined by an individualized application of the §3553 factors.   Gall v. U.S., 552 U.S. 38, 46 (2007).

This memorandum and the attached exhibits:

(1) addresses the factors set out in 18 U.S.C. § 3553(a)., which the Court must consider in determining the particular sentence to impose;
(2) sets out the reasons why the facts and circumstances of this specific case are unique to warranting a downward variance;
(3) incorporates character letters from friends, family, and colleagues who can speak to the Defendant's good character.

## Booker and 18 U.S.C. §3553(a)

The decision of the United States Supreme Court in *Booker* has rendered the United States Sentencing Guidelines "effectively advisory." *U.S. v. Booker*, 125 S. Ct. 738, 759-67 (2005). Pursuant to *Booker,* sentencing courts are required to consider Mr. Crowley's guideline range, but may "tailor the sentence in light of other statutory concerns as well." *Id.* at 767 *(citing* 18 U.S.C. § 3553 (a)).

As a result of *Booker* federal district courts must consider the seven factors set forth by 18 U.S.C. § 3553 (a) in determining a sentence:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) [the applicable Sentencing Guidelines];

(5) any pertinent [Sentencing Guidelines] policy statement;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victim of the offense.

Moreover, § 3553(a) and the 'parsimony provision' mandate that the district court "impose a sentence sufficient but not greater than necessary," to comply with the purposes of sentencing set forth in § 3553(a)(2). Sufficiency of a sentence rather than excessiveness is echoed in 18 U.S.C. § 3582, which recognizes that "imprisonment is not an appropriate means of promoting correction and rehabilitation."

## I.    Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

### a.    Nature and Circumstances of the Offense

On January 6, 2021, Mr. Crowley traveled to Washington, DC for the "Save America" Rally hosted by President Donald Trump at the Ellipse. He traveled alongside fellow members of a group known as the Guardians of Freedom (GOF), an association he had recently discovered and was in the process of joining. The allure of shared values and a common perspective to key principles motivated Mr. Crowley to try and align himself with the GOF, which was founded on a shared commitment to conservative principles and Christian values.

As he understood, travel to Washington, DC was not only to attend the rally, but also to provide volunteer security at the Rally. Mr. Crowley, still drawn to the group's shared values, saw

this as an opportunity to contribute to the safeguarding of what they perceived as foundational principles and questionable election results.

Following the conclusion of the rally, Mr. Crowley and some of his travel associates returned to their hotel. While there, they became activity that was that were beginning outside the United States Capitol (Capitol). Mr. Crowley, a medic for the group, grabbed his gear, including a vest that did not include plating, and joined his associates for the two (2) mile walk to the Capitol from their hotel.  Upon arriving at the Capitol, they found themselves quickly caught up in the fervor surrounding the protest that was taking place. Unaware that they had encroached upon restricted areas on Capitol grounds, Mr. Crowley and his associates navigated through the crowds, eventually making their way to the Lower West Terrace. Mr. Crowley, still under the impression that their presence was within the bounds of a lawful protest, followed with his associates as they continued to navigate through the crowd towards a staircase near the Lower West Terrace Tunnel. During that time the crowd became increasingly restless and various members of Mr. Crowley's group started to drift apart. As the group struggled to remain together, Mr. Crowley took it upon himself to try and remain with his codefendant, Joseph Pavlik. As Mr. Pavlik made his way into the Lower West Terrace Tunnel, the crowd, more agitated, began to make a collective push into the tunnel. As stated at trial, Mr. Crowley was one of many who were caught up in this crowd and eventually found himself just past the threshold of the tunnel entrance. While inside, he was pepper sprayed numerous times by law enforcement officers and because of the continuous push from those behind him, he resorted to protecting his face. It was during this time that he came into contact with the shield of Officer Henry Foulds, which was pressed against Mr. Crowley as part of an effort by law enforcement to remove the protestors from the tunnel area. Eventually Mr. Crowley was able to remove himself from the tunnel. Despite the continued threat of pepper spray,

Joseph Pavlik remained inside the tunnel, so Mr. Crowley returned to retrieve his assist him. During this time, Mr. Crowley was pushed forward until the crowd dispersed again and he left the tunnel. In an effort to again retrieve Mr. Pavlik, Mr. Crowley returned to the outer area of the Lower West Terrace Tunnel, but at this point was feeling the effects of repeated pepper spraying and later left the Lower West Terrace and Capitol grounds with his other associates.[1]

At no time did Mr. Crowley participate in the planning of any attack on the Capitol. He never discussed preventing any certification of the election with any party or person. Mr. Crowley did not possess a weapon or use plated defensive gear like many who were there that day. He did not resort to vandalism such as smashing windows, breaking down closed or locked doors, or damage public property. He did not act as some sort of leader in the protest, exercise authority over any participants[2], or direct other protestors to complete any tasks. He did not participate in the assault on any law enforcement officers or encourage others to do so. He did not persuade anyone to commit any acts of violence and destruction. Indeed, if the entire mass of protestors had remained outside the walls of the Capitol Building-- like Mr. Crowley; and if, the entire mass had restricted its physical acts to a forehead-to-riot-shield contact-- like Mr. Crowley, the January 6th protest would likely be a criminal non-event.

**b.   The History and Characteristics of the Defendant**

Born on September 23, 1971, in Boone, North Carolina, Mr. Crowley was raised in a very stable and supportive environment by his parents and three siblings. He grew up in a middle-class neighborhood, experienced a childhood where his basic needs were consistently met, and he never endured any form of abuse. Mr. Crowley spent his youth engaging in activities outdoors and playing sports such as soccer, where he excelled. Diagnosed with ADHD, he struggled

---

[1] Mr. Pavlik was not with them when they left the Capitol grounds
[2] He did try and help Joseph Pavlik, but never in any leadership capacity.

academically at times, but fought through those struggles to obtain his degree in landscape architecture from the University of Florida. Mr. Crowley went on to work for various firms in Orlando, Florida before starting his own business, Sustainable Design and Consulting, in 2013.

Mr. Crowley shares an exceptionally close bond with his parents, a relationship that has proven pivotal in navigating challenges that came with this case. After the passing of Mr. Crowley's mother, Inez Crowley, in 2022 he only deepened the significance of his connection with his father, Richard Crowley, who remains a cornerstone in his life. A testament to the strength of this familial tie is Mr. Crowley's willingness to travel on a 9 to 10-hour car ride to North Carolina, underscoring his commitment to spend even fleeting moments with his father. Despite Mr. Crowley's initial hesitation, prompted by concerns about his father's reaction to the offenses, at a time when his father was losing and eventually lost his wife of over fifty years, he has since opened up about the situation. Mr. Crowley's father, recognizing the complexities of his son's circumstances, has expressed unwavering support and will be present at the sentencing hearing to stand by his son if health allows. Furthermore, it is worth noting that Mr. Crowley has actively sought assistance in addressing personal challenges, particularly by engaging in efforts to overcome addiction, further demonstrating his commitment to personal growth and improvement.

Mr. Crowley shares a deeply affectionate and enduring bond with his wife, Lisa Acharekar, spanning over two decades. Beyond being devoted life partners, they have cultivated a remarkable friendship, characterized by shared interests and meaningful experiences. Their connection thrives on shared passions, such as a mutual love for reading and history, creating a rich tapestry of shared moments. Ms. Acharekar, an accomplished attorney based in Orlando, Florida, brings a wealth of professional experience to their dynamic partnership, having previously served as a prosecutor in Orange County, Florida and for the Office of Statewide Prosecution in Florida. Their relationship

is a testament to the strength of companionship and the joy derived from both shared pursuits and individual accomplishments. Ms. Acharekar has supported Mr. Crowley throughout this case, stepping aside as an attorney and playing an active role in the decisions Mr. Crowley has had to make as his wife.

Mr. Crowley is a devout Christian, expressing his commitment to his faith by regularly attending church services at two separate congregations along with bible studies and other church events. In addition to his religious involvement, Mr. Crowley actively engages in volunteer work, dedicating his time both through his church and Alcoholics Anonymous.

Importantly, Mr. Crowley, has lived a law-abiding lifestyle and his journey through addiction is a testament to his character and inherent ability to confront the consequences of his actions. It is essential to consider his past struggles with addiction, particularly during his teenage years when he developed the dependency to both alcohol and prescription narcotics[3]. Faced with the challenging reality of waking up suffering from withdrawals, Mr. Crowley at the young age of 18, exhibited commendable self-awareness. Recognizing the detrimental impact of these addictions on his life, he proactively addressed these issues and spent the next year in rehabilitation.

Since that pivotal moment, Mr. Crowley has maintained sobriety with unwavering commitment. Alcoholics Anonymous meetings have become a consistent part of his routine, underscoring his ongoing dedication to personal growth and recovery. Drawing on his personal experiences after overcoming his own challenges, he has turned adversity into a powerful force for societal betterment. With unwavering determination, he has dedicated himself to assisting individuals from diverse backgrounds grappling with the complexities of sobriety. His

---

[3] Benzodiazepines were his narcotic of choice.

compassionate approach has been especially impactful for those who felt utterly disheartened and believed they were beyond redemption. Through his genuine empathy and a profound understanding of the struggles associated with addiction, he has not only provided valuable support but has also become a beacon of hope for individuals navigating the path to recovery. His commitment to helping others is a testament to the person Mr. Crowley seeks to be.

### i.   Criminal History

Mr. Crowley has a criminal history score of zero. (PSR ¶49). In 1990, Mr. Crowley was arrested for disorderly conduct when he was 18 years old, an incident that was related to his early alcohol and drug abuse. Under U.S.S.G. §4C1.1A, Mr. Crowley qualifies as a Zero-point Offender, which may entitle him to further reductions under the guidelines. A consideration for this Court is the length of time in which he refrained from the commission of any crime as it "is a factor that is critical to a court's determination of a sentence it should impose." *United States v. Ward*, 814 F. Supp. 23, 24 (E.D.Va. 1993).

### ii.   Acceptance of Responsibility

Mr. Crowley testified to circumstances and interactions he had on January 6, 2021. His intent was not to cause harm to any law enforcement officer or person. As stated previously, Mr. Crowley did not resort to any violence during these incidents.

### iii.   Physical/Mental Condition

Mr. Crowley is in relatively good health. In 2022, he had surgery to repair his right biceps after tearing it volunteering for charity. He has not experienced any ongoing complications from this injury or surgery. (PSR §67)

As a child Mr. Crowley was diagnosed with ADHD, which led to education struggles despite his best attempts in school. In the late 2000s, Mr. Crowley dealt with suicidal thoughts

after the downturn of the housing market and his continued absence from Alcoholics Anonymous. While it was a very dark time in his life, he never attempted to take his own life. Mr. Crowley began attending Alcoholics Anonymous meetings again and was able to overcome these harmful thoughts.

## II.    __The Need for the Sentence Imposed__

Section 3553(a)(2) lists the four purposes of sentencing, which can be summarized as just punishment, deterrence, protection of the public, and rehabilitation.

### a.    __Just Punishment__

A downward variance sentence for a 52-year-old man, with one prior minor conviction, would satisfy the goals of sentencing. The advisory guidelines "do not require the judge to leave compassion and common sense at the door of the courtroom." *United States v. Johnson*, 964 F. 2d 124,125 (2nd Cir. 1992). In considering a "just punishment" for an offense, a sentencing court should also consider the additional penalties and hardships that will come with Mr. Crowley's conviction. "There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences." *United States v. Nesbeth*, 188 F.Supp.3d 179 (E.D.N.Y 2016).

The imposition of any sentence will have a tremendous impact on Mr. Crowley. He is now a convicted felon, who has lost many of the rights afforded to those without a felony record. The Court should take into account the lasting effects a felony conviction will have when sentencing Mr. Crowley.

### b.    __Deterrence__

There is no risk of recidivism in this case.   Sentencing Mr. Crowley to a term of imprisonment will not have a positive impact on his risk of recidivism. Mr. Crowley has long been

a productive and beneficial member of society, and absolutely would remain as such if the Court exercises their discretion to depart from the guidelines.

The empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. The United States Sentencing Commission has found that "Criminal History Category is a strong predictor of recidivism." U.S.S.C., *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, (2017) at 14. Offenders with zero criminal history points had re-arrest rates of 30.2%, compared with 85.7% with those with 15 or more criminal history points. *Id.* Further, "[t]here is a 22.1 percentage point difference in re-arrest rates between offenders with no criminal history and one-point offenders." *Id.*

Mr. Crowley requests to discuss this more at sentencing.

### c.  <u>Protection of the Public</u>

Mr. Crowley poses no threat to the community. Mr. Crowley, like many Americans, has deeply held political beliefs that are integral to his principles. These beliefs have been shared, like many, through social media and private text messages. Mr. Crowley, traveled to Washington, DC on January 6, 2021, with the primary intention of providing security at the rally and expressing dissatisfaction with the outcome of the 2020 presidential election. It is crucial to note again that Mr. Crowley has not issued any threats towards anyone or resorted to violence to anyone based on his beliefs. Contrary to the unfortunate turn of events during what was intended to be a peaceful protest at the Capitol, Mr. Crowley found himself caught in the chaos. Importantly, he unequivocally disapproves of the actions of those who resorted to violence against any person during the protest.

**d.  Rehabilitation**

Imprisonment does not satisfy the goal of rehabilitation.  "The court, . . .  in determining the length of [a term of imprisonment], shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation."  18 USC §3582(a).  The advisory sentence contained in Mr. Crowley's PSR involves incarceration and would not promote rehabilitation. As stated previously Mr. Crowley still attends regular Alcoholic Anonymous meetings to his sobriety of thirty plus years.

**III.   The Kinds of Sentences Available**

The maximum term of imprisonment for Count One is five (5) years.  (PSR ¶98).  The guideline range calculated in the PSR is based on his offense level of 15 and criminal history category of I is 18 months to 24 months.  (PSR ¶ 101).  Mr. Crowley has objected to the guideline range as calculated but stands by the belief that given the relatively low guideline range a downward variance to probation is appropriate given the reasons discussed throughout this memorandum.

**IV.   The Applicable Sentencing Guidelines (and Policy Statements)**

**a.  The Government's enhancement for "physical" contact under U.S.S.G. §2A2.4(b)(1)(A).**

The Government is seeking the addition of three (3) points for role adjustment in this as they argue this offense involved "physical contact" between Mr. Crowley and Officer Henry Foulds in the tunnel. (PSR ¶ 29)

As a first matter, Mr. Crowley did not have physical contact with Officer Foulds. The two were separated by the officer's riot shield and there was no direct contact between them. Notably, there is no provision for indirect contact within the guideline or its commentary. The rule of lenity

prohibits an expansive reading of criminal laws. In recognition of this, the Guidelines themselves give narrow definitions to terms commonly used. Thus, in the definition section in USSG §1B1.1, "physical restraint" is defined as "forcible restraint...such as being tied, bound, or locked up." In short, the term is restricted to actual physical restriction as opposed to being under threat not to leave a particular area. In a similar vein, 'physical contact' is limited to the plain meaning of the term and no more. But see, *U.S. v. Taliaferro*, 211 F.3d 412 (7th Cir., 2000) (throwing cup of urine on correctional officer is physical contact)

It should be noted that there were many individuals that were in the space outside and inside the West Terrance tunnel. There was a group inside the tunnel engaged in varying levels of physical encounters with law enforcement officers. Mr. Crowley does not dispute his presence in the area, as he testified to at trial his presence was in part to retrieve his associate, Joseph Pavlik, from the fray that was breaking out in the tunnel.

Mr. Crowley's contact with the riot shield was incidental and was initiated by Officer Foulds. In this regard, and in the video, Mr. Crowley is seen with his head bowed forward approximately one inch from the shield. After several seconds, the shield moves forward and comes into contact with Mr. Crowley's forehead. (Axon body 3, X6039BF8H- Ledge video at 16:06:09). Thereafter, the shield and Mr. Crowley's head remain in contact for the next 14 seconds. There is no apparent movement by Mr. Crowley's hands or arms. In *U.S. v. McKeiver*, 982 F. Supp. 842, 846 (M.D. Fla., 1997), District Court concluded that a sentencing court "may enhance a defendant's sentence by applying U.S.S.G. § 2A2.4 (b)(1) based on defendant-initiated physical contact, but not based on victim-initiated physical contact. This is true because the term "conduct" in § 2A2.4(b)(1) requires the sentencing court to focus on the defendant's conduct. Even if the government has shown that § 2A2.4(b)(1) is ambiguous in the context of victim-initiated physical

contact, the sentencing court still will not apply the enhancement. Where a criminal statute is ambiguous, the Court must resolve any ambiguities in favor of the defendant." (Citations omitted).

Because Mr. Crowley's head-on-shield contact was short-lived, indirect, and incidental, it is outside the heartland of cases which are contemplated by U.S.S.G. § 2A2.4 (b)(1).

### b. Adjustment for Certain Zero-point Offenders under U.S.S.G. §4C1.1

Under United States Sentencing Guidelines §4C1.1, Zero Point Offenders are individuals who, despite engaging in criminal conduct, have a criminal history score of zero (0). This provision recognizes that certain offenders who may have committed their current offense without history of prior convictions that can be scored. The rationale behind this guideline is to tailor sentencing to the specific circumstances of each case, allowing for a more nuanced and equitable approach that considers both the nature of the offense and the offender's criminal history. It underscores the principle that individuals with a minimal or non-existent criminal history may warrant different sentencing considerations than those with a more extensive history of criminal conduct.

In this case Mr. Crowley meets the criteria set out in U.S.S.G. §4C1.1 and is not disqualified under the enumerated disqualification provisions. Therefore, the Court should reduce his guidelines by two (2) points in compliance with this guideline.

### c. Multiple Count Adjustment (Grouping) under U.S.S.G. §3D1.4(a), (b)

The Government is seeking a Multiple Count Adjustment under U.S.S.G. §3D1.4(a), (b) grouping Count 3 separately from the other counts in Mr. Crowley's conviction. (PSR ¶¶ 40; 43) "For purposes of grouping offenses, Sentencing Guidelines require more than similar offense level calculations and more than ongoing or continuous offense behavior;  there must be some link between defendant's offenses before grouping is appropriate." *U.S. v. Bordinaro*, 777 F.Supp. 1229 (E.D.Pa.1997).

U.S.S.G §3D1.2 reads:

All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

(a) When counts involve the same victim and the same act or transaction.

(b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

(c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

Ordinarily, the first step in determining the combined offense level in a case involving multiple counts is to identify those counts that are sufficiently related to be placed in the same Group of Closely Related Counts ("Group"). Here the argument is that all of the counts for which Mr. Crowley has been convicted of do stem from a continuous link of actions. The Court found that Mr. Crowley entered restricted grounds when he entered the area around the West Terrance Tunnel and his actions did impede, obstruct, and interfere with the passage of law enforcement officers who were attempting to remove other protestors from the tunnel area.

The Court's own findings when announcing the verdict in this case stated that Count 3, Entering and Remaining in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(1), 1752(b)(2), was committed when Mr. Crowley entered the tunnel and was privy to the police line that had been set up. In announcing his findings and guilty verdicts as to Counts 1, 6, and 12 the Court cited to specific actions that took place in the tunnel. Specifically in Count 1: Civil Disorder under 18 U.S.C. § 231(a)(3) that his presence interfered with tunnel law enforcement, and did in

fact impede, obstruct, and interfere with their lawful duties. On Count 6: Disorderly and Disruptive Conduct in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(2), 1752(b)(2) that his actions outside and within the tunnel disrupted the lawful duties of law enforcement officers. On Count 12: Impeding Passage Through the Capitol Grounds or Buildings under 40 U.S.C. §§ 5104(e)(2)(E), 5109(b), that by entering tunnel and remaining he impeded the passage of law enforcement who were trying to remove protestors from the tunnel.

These counts all involve substantially the same ongoing harm and should be grouped together. As a result, the increase in offense level under USSG §3D1.4 is not appropriate and the resulting two (2) point enhancement should not be applied.

## V.    The Need to Avoid Unwarranted Sentence Disparities

18 U.S.C. §3553(a)(6) advises the court to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  In *Booker*, the United States Supreme Court stated,

> [t]his point is critically important. Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity. That uniformity does not consist simply of similar sentences for those convicted of violations of the same statute. . . . It consists, more importantly, of similar relationships between sentences and real conduct. . . ."

*Booker*, 543 U.S. at 254 (*citing* 28 U.S.C. § 991(b)(1)(B); § 994(f).

The need to avoid unwarranted sentence disparities is especially heightened in a case like this which is unique in the level of prosecution and number of various defendants across the spectrum.  We recognize the unique nature of these cases have provided with numerous opportunities to not only personally sentence other similarly situated defendants, but also see the sentences of the court's colleagues.

As noted in the PSR, Mr. Crowley's co-defendants received the following sentences.

- *United States v. Brian Preller* – Sentenced to 5 years' probation for a Civil Disorder charge under 18 U.S.C. §231(a)(3);

- *United States v. Joseph Pavlik* - Sentenced to 2 months imprisonment followed by 2 years' supervised release for a Civil Disorder charge under 18 U.S.C. §231(a)(3) and Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon under 18 U.S.C. 1752(a)(1) and (b)(1)(A).

- *United States v. Benjamin Cole*, Sentenced to 48 months' probation for Civil Disorder charge under 18 U.S.C. §231(a)(3).

- *United States v. Jonathan Alan Rockholt* –Sentenced to 5 months imprisonment and  2 years' supervised release for Civil Disorder charge under 18 U.S.C. §231(a)(3).

- *United States - Tyler Quintin Bensch* – Sentenced to 2 years' probation for Civil Disorder charge under 18 U.S.C. §231(a)(3).

Mr. Crowley recognizes that the determination of sentencing disparities goes well beyond the co-defendants. Similar cases have flooded the courts in the District of the District of Columbia, including the small sample of similar cases below:

In the *United States v. Eric Gerwatowski*, 22-CR-00125-JMC, the Defendant confronted Capitol Police while they were attempting to close Capitol doors to prevent further protestors from getting into the building. The Defendant pulled open one of the doors that the Capitol Police had just closed. He then turned to the mob and yelled, "Let's go!" and directed more rioters into the building. He then entered the building.  While the Government was recommending a sentence of 3 months incarceration followed by probation, the Court sentenced him to 24 months' probation with 30 days home detention.

In the *United States v. Andrew Griswold* - 1:21-cr-459-CRC, the defendant was part of a

group of protestors that gathered together outside the Capitol's East Rotunda doors. With a crowd similar to the West Terrace Tunnel, the defendant joined the crowd and pushed his way into the Capitol and eventually making it into the Senate Gallery. He was later indicted and plead to Civil Disorder under 18 U.S.C. §231(a)(3) Despite several prior convictions, he received a sentence of 75 days incarceration and 24 months supervised release.

### VI.    Letters of Good Character

Several letters of good character are attached as exhibits to this motion. These letters are intended to provide the Court with some context of who Mr. Crowley is outside of this case.

### CONCLUSION

Throughout Mr. Crowley's life, he has consistently demonstrated a commitment to lawful, compassionate, and diligent living, fueled by a genuine love for his country. In light of his unblemished criminal history, Mr. Crowley respectfully urges this Honorable Court to exercise its discretion and consider a sentence of probation. Such a disposition not only aligns with the principles of justice but also serves as a fitting deterrent against any future criminal behavior. By opting for probation, the Court would effectively foster respect for the law, ensuring a just punishment for the offense without imposing an undue burden greater than necessary. Mr. Crowley believes that this approach embodies a balanced and thoughtful response, reflecting the unique circumstances of his case.

Such a sentence would serve as an adequate deterrent to future criminal conduct, would 'promote respect for the law and provide just punishment for the offense' and would be "sufficient but not greater than necessary."

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on the 12th day of January, 2024, I electronically filed the foregoing, with the Clerk of the Court, by using the CM/ECF system, which will send a Notice of Electronic Filing to the following:   Assistant United States Attorneys: Holly Grosshans Holly.Grosshans@usdoj.gov; Joshua Ontell Joshua.Ontell@usdoj.gov; and Jake Struebing@usdoj.gov.

Respectfully Submitted,

<u>*s/Joseph Flynn*</u>
Joseph Flynn
Attorneys for the Defendant
1238 E Concord Street
Orlando, FL 32803-5453
Office: 407-557-6350
trey@treyflynn.com

<u>*/s/Michael H. LaFay*</u>
Michael H. LaFay, Esquire
Attorney for the Defendant
NeJame Law
189 S. Orange Avenue, Suite 1800
Orlando, Florida 32801
Telephone: (407) 500-0000
Facsimile: (407) 802-1451
Primary E-mail: lafaym@nejamelaw.com
Secondary: nita@nejamelaw.com